| Termination Date | Case Nos. | Opposing Party | Case Type | Disposition |
|---|---|---|---|---|
| 12/29/92 | 92–3342 | McKune | Appeal | Dismissed |
| 01/14/93 | 92–3372 | Leavenworth Postmaster | Appeal | Dismissed |
| 04/28/93 | 92–3281)<br>92–3334)<br>92–3335)<br>92–3369) | Coleman | Appeal | Affirmed |
| 04/16/93 | 92–3169 | McKune | Appeal/<br>Mandamus | Affirmed/<br>Denied |
| 04/16/93 | 92–3035 | Whitaker | Appeal | Affirmed |
| 04/21/93 | 92–3132 | Ft. Scott Tribune | Appeal | Affirmed |
| 04/21/93 | 92–3116 | U.S. Trustee's Office | Appeal | Affirmed |
| 04/16/93 | 92–3151 | State of Kansas | Appeal | Affirmed |
| 04/16/93 | 92–3112 | Thompson, U.S. Atty. | Appeal | Affirmed |
| 05/03/93 | 93–552 | Saffels, Judge | Mandamus | Denied |

Cases Pending (May 18, 1993)

| | Case Nos. | Opposing Party | Case Type | |
|---|---|---|---|---|
| | 92–3306)<br>92–3376) | Hart, Judge | Appeal | |
| | 92–3019 | Coleman | Appeal | |
| | 93–3121 | Stotts | Appeal | |
| | 93–3036 | Hart, Judge | Appeal | |
| | 93–3104 | City of Mapleton | Appeal | |
| | 93–3081 | Hart, Judge | Appeal | |
| | 93–3140 | McKune | Appeal | |
| | 93–3144 | McKune | Appeal | |

Leo and Arlene ZUCHEL, individually, and on behalf of the deceased, Leonard Zuchel, Plaintiffs–Appellees/Cross–Appellants,

v.

The CITY AND COUNTY OF DENVER, COLORADO, Defendant–Appellant/Cross–Appellee.

Nos. 91–1379, 91–1395 and 91–1400.

United States Court of Appeals, Tenth Circuit.

June 23, 1993.

Rehearing Denied Aug. 23, 1993.

Theodore S. Halaby (Robert M. Liechty, with him on the briefs), Halaby, McCrea & Cross, Denver, CO, for defendant-appellant.

Wade H. Eldridge, Wade H. Eldridge, P.C., Denver, CO, for plaintiffs-appellees.

Before SEYMOUR, MOORE, and TACHA, Circuit Judges.

SEYMOUR, Circuit Judge.

The City and County of Denver (hereinafter Denver) appeals from a jury verdict and an award of attorneys fees in favor of Leo and Arlene Zuchel. The Zuchels brought this action individually and on behalf of their deceased son, Leonard Zuchel, seeking damages under 42 U.S.C. § 1983 (1988), for his death at the hands of a Denver police officer. The Zuchels cross-appeal from the district court's refusal to award prejudgment interest. For the reasons set out below, we affirm.

I.

The Zuchels sued Denver and Denver police officer, Frederick Spinharney, after Officer Spinharney shot and killed Leonard Zuchel while investigating a street incident. The Zuchels alleged that Officer Spinharney violated Leonard Zuchel's constitutional rights by using unreasonable and excessive force during the incident. They further allege that Denver's failure to adequately train its police officers constituted deliberate indifference to the constitutional rights of its citizens and was a direct cause of the shooting.

Officer Spinharney filed a motion for summary judgment asserting that he was entitled to qualified immunity. The district court denied the motion and the officer brought an interlocutory appeal. We affirmed the district court, concluding that material issues of fact precluded determining as a matter of law whether Officer Spinharney's conduct was objectively reasonable. *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989). The Zuchels subsequently settled their claim against Officer Spinharney and the case proceeded to trial only on the claim against Denver. The jury returned a verdict for the Zuchels in the amount of $330,000. Denver moved for judgment notwithstanding the verdict, alleging that the evidence was insufficient to support the jury verdict. The district court denied the motion.

Denver asserts on appeal that the trial court erred in denying its motion for j.n.o.v.

because the evidence either is insufficient to support the jury's verdict or establishes Denver's right to judgment as a matter of law. In the alternative, Denver seeks a new trial on the basis of two evidentiary rulings by the trial court. Finally, Denver challenges the trial court's calculation of the attorneys fees awarded the Zuchels. The Zuchels challenge the lower court's refusal to award prejudgment interest. We address each argument in turn.

## II.

Denver contends that the district court erred in denying its motion for j.n.o.v., arguing strenuously that the evidence does not support the jury's verdict. We begin our assessment of this claim by reiterating the standards governing our review of the trial court's ruling on a j.n.o.v. motion.

[W]e employ the same standard of review as does the trial court. *Brown v. McGraw–Edison Co.,* 736 F.2d 609, 613 (10th Cir.1984); *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 680 (10th Cir.1981). "Judgment n.o.v. is proper only when the evidence so strongly supports an issue that reasonable minds could not differ." *Delano v. Kitch,* 663 F.2d 990, 1002 (10th Cir. 1981) (citing *Symons v. Mueller Co.,* 493 F.2d 972, 976 (10th Cir.1974); *Swearngin v. Sears, Roebuck & Co.,* 376 F.2d 637, 639 (10th Cir.1967)); *see also Carter v. City of Chattanooga,* 803 F.2d 217 (6th Cir.1986). We must view the evidence in the light most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence. *Brown,* 736 F.2d at 613; *see also Martin v. Unit Rig & Equip. Co.,* 715 F.2d 1434, 1438 (10th Cir.1983). A reviewing court "is not permitted to consider the credibility of witnesses in reaching its decision ... nor may a court weigh the evidence or determine where the preponderance of the evidence lies." *Martin,* 715 F.2d at 1438 (citing *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); *Wylie v. Ford Motor Co.,* 502 F.2d 1292, 1294 (10th Cir.1974)). Moreover, if there is conflicting or insufficient evidence to warrant a "one-way con-

clusion," a directed verdict or judgment n.o.v. is inappropriate. *Id.* Generally, a directed verdict or a motion for a judgment n.o.v. "should be cautiously and sparingly granted." *Id.* (quoting *Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabricating, Inc.,* 584 F.2d 946, 951 (10th Cir. 1978)); *see also Selle v. Gibb,* 741 F.2d 896 (7th Cir.1984).

*Ryder v. City of Topeka,* 814 F.2d 1412, 1418 (10th Cir.1987).

The Zuchels' claim against Denver is based on the theory of municipal liability set out in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Accordingly, the Zuchels alleged that Denver was deliberately indifferent to the inadequacy of its police training program, and that this inadequacy was directly linked to Officer Spinharney's unconstitutional use of excessive force. In presenting this claim to the jury, the trial court instructed that:

In order for the plaintiffs, Arlene and Leo Zuchel, ... as personal representatives of the estate of Leonard Zuchel, to recover from the defendant City and County of Denver on their claim of deliberate indifference to the rights of persons with whom its police officers come in contact, ... you must find all of the following to have been proved:

First, that Officer Frederick Spinharney exceeded the constitutional limitations in the use of deadly force, in shooting Leonard Zuchel, as further defined in these instructions.

Second, that such use of deadly force arose under circumstances which constitute [a usual] and recurring situation with which police officers must deal.

Third, that there is a direct causal link between the alleged constitutional deprivation and the alleged inadequate training that the city provided to all its police officers on the constitutional limitations of the use of deadly force, in such usual and recurring circumstances.

And, fifth [sic, should be fourth] that the failure to ... train demonstrates a deliberate indifference on the part of the city's chief of police regarding persons with

whom the city's police officers come into contact.

Now, deliberate indifference means an act or omission purposefully committed by a person who must have realized that the conduct was unnecessarily dangerous or which conduct was done heedlessly or recklessly, without regard to the consequences, or without regard to the rights and safety of others.

If you find that any one of these four propositions has not been proved by a preponderance of the evidence, then the verdict must be for the defendant.

On the other hand, if you find that all of these four propositions have been proved by a preponderance of the evidence, then your verdict must be for the plaintiff.

Aplee.App. at 369–71. Denver did not object to this or any instruction below and concedes on appeal that the jury was properly instructed. Indeed, the instructions are clearly correct under *City of Canton*, 489 U.S. at 389–91, 109 S.Ct. at 1205–06. Accordingly, we review the record to ascertain whether the evidence, when viewed most favorably to plaintiffs, is sufficient to support the jury's determination that the Zuchels established the above four factors by a preponderance of the evidence.

### A.

■ The Zuchels were first required to establish that Officer Spinharney's use of deadly force was unconstitutional. In this regard, the court instructed the jury to "determine whether the force that Officer Spinharney used was reasonable as judged from the perspective of a reasonable officer on the scene." Aplee.App. at 371. The jury was further instructed to

allow for the fact that police officers are often forced to make split second judgments in circumstances that are tense and uncertain and rapidly evolving about the amount of force that is necessary in a particular situation.

This reasonableness inquiry in an excessive force case [is] an objective one. The question is whether the officer's actions are objectively reasonable, in light of the facts and circumstances confronting him,

without regard to ... the officer's underlying intent and motivation.

*Id.* at 371–72.

The following undisputed facts provide a general description of the tragic events giving rise to this litigation. In the early evening of August 6, 1985, Leonard Zuchel created a disturbance at a fast food restaurant. The manager called the police, but Zuchel left the restaurant before they arrived. Officer Spinharney and his partner, Officer Teri Rathburn Hays, answered the call. The manager told them that Mr. Zuchel had gone around the corner and the officers went looking for him. In the meantime, Mr. Zuchel had become involved in a heated exchange with four teenagers on bicycles. When the officers approached Mr. Zuchel and the teenagers, one of them shouted that Mr. Zuchel had a knife. As the officers walked toward Mr. Zuchel and he turned toward them, Officer Spinharney shouted at Mr. Zuchel and then shot him four times. A pair of fingernail clippers was found near Mr. Zuchel's body.

Several people observed the shooting. One witness, Jeffrey Purvis, was on the outdoor terrace area of a restaurant across the street. *Id.* at 3. He testified that nothing interfered with his view of the incident. He heard a commotion and saw the teenagers approach Mr. Zuchel on their bicycles and begin arguing with him. One of the boys got off his bike and moved closer to Mr. Zuchel while the others stayed eight to ten feet back. Mr. Purvis then saw the officers walking north towards the group. Mr. Purvis testified that Mr. Zuchel was facing north toward the teenagers and had no idea that the police were behind him. As the officers walked toward Mr. Zuchel, Officer Hays stopped and Officer Spinharney proceeded up behind Mr. Zuchel. Mr. Purvis stated that

the officer at this point is behind him and ... he has the gun out; and his hands are on the gun, and he says to the man that got shot that "you better shut up," because they're arguing—"you better shut up, or you're going to die."

*Id.* at 11. Mr. Purvis testified that Mr. Zuchel turned toward Officer Spinharney when the teenager told him there was an officer behind him. Mr. Purvis described Mr. Zuchel as taking three wobbly steps toward Officer Spinharney, who was six to eight feet away. According to Mr. Purvis, "it was no time after that he turned around that he was shot and laying on the ground." *Id.* at 13. Mr. Purvis stated that Officer Spinharney had his gun out while Mr. Zuchel was facing away from him, that Mr. Zuchel's hands were up in the air when he turned, and that Mr. Zuchel did not charge toward Officer Spinharney. Mr. Purvis testified that "they were so far apart, . . . there was no one in danger at that time." *Id.* at 17.

A second witness to the shooting, Debra Seme, was a security guard at a building close to where the shooting took place. She had noticed Mr. Zuchel, who was sitting alone in front of the building crying to himself. She watched Mr. Zuchel as he and the teenagers began shouting at each other and saw Officer Spinharney approach. She testified that her view was "great." *Id.* at 60. According to Ms. Seme, as Officer Spinharney came up to Mr. Zuchel, Mr. Zuchel had his back to him and did not turn around until Officer Spinharney shouted at him to shut up. At that point they were about ten feet apart. Ms. Seme testified that when Mr. Zuchel turned around, Officer Spinharney drew his gun. Mr. Zuchel was pointing over his left shoulder toward the teenagers and looking to his left side. She heard the officer tell Mr. Zuchel to "drop it," but she saw nothing in Mr. Zuchel's hands. *Id.* at 62. Mr. Zuchel's "right hand was on his side," and his "left hand was still pointing backwards." *Id.* "[T]hen Mr. Zuchel took three steps and the police officer shot his gun four times." *Id.* She testified that Mr. Zuchel was not charging the officer and made no slicing or stabbing motions toward him.

Officer Hays, Officer Spinharney's partner at the time of the shooting, testified that as she and Officer Spinharney approached Mr. Zuchel from behind, she hollered, "Hey" to get his attention, and he turned around in a normal fashion. *Id.* at 114–15. Officer Spinharney's gun was out as soon as Mr. Zuchel turned. She heard one of the teenagers say, "Watch out: he's got a knife." *Id.* at 115. Officer Spinharney said, "Drop it. Drop it." *Id.* at 116. He had the gun in both hands extended out in front of him. She testified that at that point they were approximately fifteen feet from Mr. Zuchel, *id.* at 120, she was moving toward Mr. Zuchel's right and saw nothing in his right hand, but she did not have a clear view of his left hand. She was right next to Mr. Zuchel when he was shot because she was intending to "grab him in some fashion or try to get him physically under some control until my partner could, you know, assist me." *Id.* at 123. She testified that Mr. Zuchel was "walking forward at a slow pace," *id.* at 128, and was approximately four to five feet from the officer's extended weapon, *id.* at 126. She was surprised when she heard the first shot because she hadn't expected her partner to shoot Mr. Zuchel. *Id.* at 130.[1]

The version of the shooting as described by the above eyewitnesses is consistent with the testimony of the Denver coroner, Dr. George Ogura, who performed the autopsy on Mr. Zuchel. Dr. Ogura, who was qualified as an expert, testified regarding the pattern of powder burn marks on Mr. Zuchel's right forearm and chest. According to Dr. Ogura, this pattern indicated that Mr. Zuchel's right arm, rather than being extended out toward Officer Spinharney, was directly across his chest when he was shot in the chest while facing Officer Spinharney. This evidence indicates that Mr. Zuchel was not approaching the officer with his arm extended in a threatening manner. Dr. Ogura's testimony along with the evidence recited above is thus more than adequate to support the jury's finding that Officer Spinharney's use of deadly force was not objectively reasonable under the circumstances.

In an effort to avoid the dispositive effect we must give this evidence under the standards governing review of j.n.o.v. rulings,

---

1. There were a number of other eyewitnesses to the incident whose versions were more favorable to Officer Spinharney. *See Zuchel v. Spinharney,* 890 F.2d 273, 275 (10th Cir.1989). For whatever reason, Denver chose not to call these witnesses at trial.

Denver makes several related and misdirected arguments. First, it urges us to disregard the above testimony and credit other evidence more favorable to the City. "However, '[j]ury findings on sharply conflicting evidence are conclusively binding on appeal inasmuch as jurors are charged with the exclusive duty of assessing the credibility of witnesses and determining the weight to be given to their testimony.'" *Ryder,* 814 F.2d at 1421 (quoting *White v. Conoco, Inc.,* 710 F.2d 1442, 1443 (10th Cir.1983)).

Building upon this improper premise, Denver assumes that the shooting itself was constitutional, even if Officer Spinharney's conduct prior to the shooting may have been improper.[2] It then relies on cases that have upheld a use of deadly force when justified under the circumstances, even though the officer's preshooting conduct was unreasonable. *See* Aplt. Opening Br. at 22. These decisions are not persuasive when, as here, the evidence supports the view that the shooting itself was not justified.

■ Denver also makes the following convoluted argument. First, it contends that we must credit the evidence tending to show that the shooting was justified because that version of the shooting is the only one implicating a city policy. The basis for Denver's assertion is its position that the record contains no evidence linking an unconstitutional shooting to a city policy. In making this argument, it misstates both the applicable theory of liability and the record. Denver asserts that it can only be liable for an unconstitutional use of deadly force if it had a policy condoning the unprovoked shooting of citizens. However, in *City of Canton v. Harris,* 489 U.S. at 386–88, 109 S.Ct. at

1203–04, the Supreme Court expressly rejected the argument that a city is only liable when the municipal policy itself is unconstitutional. Rather, the Court held that "if a concededly valid policy is unconstitutionally applied by a municipal employee, the City is liable if the employee had not been adequately trained and the constitutional wrong has been caused by that failure to train." *Id.* at 387, 109 S.Ct. at 1204. Moreover, as we discuss below, *see* Part II C *infra,* the record contains sufficient evidence to support the jury's finding that the inadequacies in Denver's police training program were directly linked to the unconstitutional shooting.

### B.

■ Having concluded that the record supports the jury's finding that the shooting was an unconstitutional use of deadly force, we turn to the second element that the Zuchels were required to prove. We must determine whether the record contains evidence tending to show that the circumstances giving rise to the shooting here represented a usual and recurring situation with which police officers were required to deal.

On February 14, 1983, the Denver district attorney, Norman Early, sent a letter to the then Denver police chief, Art Dill. In this letter, Mr. Early discussed the issue of deadly force incidents between citizens and Denver police officers and made numerous suggestions "for strengthening our effort in this vital area." Aplt.App. at 179. Mr. Early pointed out that:

> Since the beginning of this year, there have been five instances in which citizens have been injured or killed by peace officers, and one in which an officer was

---

**2.** Denver bolsters its position by stating that plaintiffs' own expert on police training and procedures, James Fyfe, acknowledged that the decision to shoot was reasonable. This characterization of Mr. Fyfe's testimony is disingenuous at best. Mr. Fyfe opined that the shooting was justified only when the City's attorney asked him to assume as true that version of the circumstances most favorable to the City. *See* Aplee. Supp.App. at 329–41. When Mr. Fyfe was asked to assume circumstances favorable to plaintiffs, he stated that the shooting was unjustifiable. *Id.* at 349–50.

We are compelled to point out that throughout the proceedings before this court, Denver has mischaracterized the record and has at times arguably misrepresented it. *See, e.g., Zuchel v. Spinharney,* 890 F.2d at 275–76 (defendant's "one-sided factual summary . . . is only part of the picture presented by the evidentiary record"). Moreover, in its arguments on appeal, Denver has repeatedly assumed that we will view the evidence most favorably to its position, and has urged us to reweigh the evidence and reevaluate credibility. The standards of review governing j.n.o.v. rulings, of course, are precisely to the contrary.

*seriously injured.* The circumstances vary greatly but point to the need for meaningful reflection and action by both citizens and law enforcement personnel. We must not only attempt to prevent violent confrontations between citizens and police but also try to learn something from each one. To be of maximum effectiveness, we need a concerned effort from citizens, police, and district attorneys. While no officer relishes facing a situation that is likely to result in his death, that of his partner, or a citizen, I am sure that each one wants to be fully equipped to make the very best decision when the situation arises.

*Id.* at 178 (emphasis added). The general tenor of this letter, as well as the fact that six police-citizen encounters involving deadly force had occurred within a six-week period, support a reasonable inference that such encounters were a usual and recurring problem.[3] Mr. Early also stated in trial testimony that it was foreseeable that officers would be placed in situations where they would have to make split second decisions on whether to shoot. *Id.* at 221.

In addition, we note the testimony of plaintiffs' expert, Mr. Fyfe. At the time of trial, Mr. Fyfe was a professor in the School of Public Affairs at American University in Washington, D.C., teaching courses on the criminal justice system. As his doctoral research, Mr. Fyfe analyzed New York City police shooting incidents during a four year period. He had been a senior fellow at the Ford Foundation, where he undertook several projects on helping police avoid the use of deadly force. Mr. Fyfe was on the Commission on Accreditation for Law Enforcement Agencies, which assesses and accredits police departments, as well as serving as a deadly force consultant to several departments. He has given lectures on the use of force to, among others, the FBI Academy, district attorney associations, and police associations. He has testified before Congress and state legislatures, and has given expert testimony in excessive force cases on behalf of both plaintiffs and defendants. Before he became a professor, Mr. Fyfe spent sixteen years as an officer with the New York City Police Department. The district court qualified Mr. Fyfe as an expert in police tactics, use of force, administration, supervision, and training. Mr. Fyfe testified that "[i]t's predictable in big cities that police officers will run into situations where they're going to have to make judgments as to whether or not to shoot. And if they're not periodically trained and instructed on how to do that appropriately, they'll make mistakes." Aplee.Supp.App. at 277.

The above evidence supports the jury's determination that deadly force encounters are a usual and recurring circumstance facing Denver police officers. Denver's argument to the contrary simply disregards this evidence.

### C.

■ Next we review the record for evidence that Denver's police training program was inadequate, and for evidence that any inadequacy was directly linked to Officer Spinharney's unconstitutional use of excessive force.

In his letter to Chief Dill, Mr. Early recommended, as part of his proposed program to minimize police shootings, that the Denver Police Department institute or expand training on "[s]trategic skills development; how to analyze situations, develop options, and select the option that minimizes the likelihood of a violent confrontation," and that Denver establish "[p]eriodic target course 'shoot-don't shoot' live training under street conditions, particularly for officers on the front line." Aplt.App. at 179. Plaintiffs presented testimony by Ronald Wolf, a Denver police detective, that Denver made no effort after receiving Mr. Early's letter to implement the recommended periodic live "shoot-don't shoot" training on a target range. *Id.* at 239.

Officer Hays, who was Officer Spinharney's partner at the shooting incident, testified that she became a police officer in 1982. Her training at the Denver Police Academy included a lecture series on decisional shooting. She did not receive live training on a

---

3. See the Appendix to this opinion for the text of the entire letter.

"shoot-don't shoot" range at the Academy or at any time before Leonard Zuchel was shot in 1985. Detective Wolf testified that prior to 1983 the Academy's "shoot-don't shoot" program consisted of a lecture and a movie. Detective Wolf also testified that Academy trainees were taken to an empty building and shown how to search it in a safe manner and that this training could potentially involve "shoot-don't shoot" decisions. However, it is undisputed that Denver did not implement periodic live range training as suggested by Mr. Early. The record likewise contains no evidence that Denver periodically retrained its officers using the film and lecture. Detective Wolf stated that he knew Officer Spinharney saw the "shoot-don't shoot" movie at the Academy, but he did not know whether Officer Spinharney had received training on searching a building.

Mr. Fyfe, plaintiffs' expert on police training and the use of deadly force, was asked to evaluate the Denver "shoot-don't shoot" training program which existed prior to the Zuchel shooting. Mr. Fyfe testified that "shoot-don't shoot" instruction should involve more than the decision on pulling the trigger at the critical moment, and should include training on how to avoid getting into that predicament in the first place. *See* Aplee. Supp.App. at 291–92, 327, 352. Mr. Fyfe stated that, in his opinion, a training film was not an effective way for police officers to learn "shoot-don't shoot" techniques.

> I have found that police officers regard the movies quite often as video games and that role-play situations in which instructors play the part of adversaries, burglary suspects, deranged people, robbers, and police officers were assigned to deal with them[,] are much more effective. The cops become much more involved, and they're

much more realistic. But one film is not [adequate] certainly.

*Id.* at 268.

Mr. Fyfe testified that if the only training Officer Spinharney had received in "shoot-don't shoot" was seeing one movie while he was in the Academy, his training was "grossly inadequate." *Id.* at 270. Mr. Fyfe further testified that without the periodic live range training suggested by Mr. Early, "the standards of the Denver Police Department were far below the generally accepted police custom and practice at the time." *Id.* at 276. When specifically asked whether the lack of live range training *alone* rendered Denver's training program inadequate, Mr. Fyfe answered affirmatively. *Id.* at 290. He stated that so many of the other suggestions made by Mr. Early "are involved with shoot/don't shoot that if shoot/don't shoot weren't there, other things wouldn't exist, like the judgment and strategies. That's usually done through the shoot/don't shoot training." *Id.* Mr. Fyfe further stated he knew "of no other way to do it except through the shoot/don't shoot field exercises. You can't teach strategic judgment—judgment on strategic skills in a classroom."[4] *Id.* at 290–91.

Mr. Fyfe was asked whether in his opinion the inadequacies in Denver's police training program were connected to the shooting of Mr. Zuchel. Mr. Fyfe responded:

> It's my opinion that the absence of training caused the shooting of Mr. Zuchel. Officer Spinharney handled this just the way any guy on the street would. He did not handle it as a professional, trained police officer who had received training on when it was appropriate to shoot and when it was

---

**4.** The instant case is thus distinguishable from *Medina v. City & County of Denver*, 960 F.2d 1493 (10th Cir.1992). There we upheld a grant of summary judgment for the defendant city on a claim that its police pursuit policy was inadequate. In so doing, we concluded that the plaintiff's summary judgment showing, which consisted of a conclusory allegation with no supporting evidence, was inadequate as a matter of law. In referring to the defendant's evidence tending to show that the city was in fact concerned with public safety during police chases and had a defensive emergency vehicle operations course

and training policy, we said: "Although this evidence by itself might not warrant summary judgment for defendants if the appellant had presented evidence to the contrary, the appellant presented no evidence, other than conclusory allegations, that the Denver Police Department had a policy or custom of being deliberately indifferent to bystander safety during high speed chases." *Id.* at 1500–01.

Here, to the contrary, the expert supported his opinion that the training program was inadequate with specific deficiencies supported by the record.

appropriate not to shoot would have handled this situation. *Id.* at 278.

Viewing the above evidence most favorably to plaintiffs, it is clearly sufficient to support the jury's determination that the Denver police training program in place prior to the Zuchel shooting was inadequate, and that a direct connection existed between the inadequacy and the shooting. In response to this evidence, which again is dispositive on review of a j.n.o.v. ruling, Denver merely points to contrary evidence and asks us to reweigh the record.

## D.

■ Finally, we consider whether there is evidence sufficient to sustain the jury's determination that the Denver Police Department was deliberately indifferent to the rights of persons with whom the police come in contact. The trial court instructed the jury that "deliberate indifference means an act or omission purposely committed by a person who must have realized that the conduct was unnecessarily dangerous or which conduct was done heedlessly or recklessly, without regard to the consequences, or without regard to the rights and safety of others." *Id.* at 370.[5]

■ We begin by referring again to the letter Mr. Early wrote Chief Dill in 1983.

*See* note 2 *supra;* Appendix *infra.* This letter pointed out that six deadly force incidents involving citizens and police officers had occurred during the previous six-week period. In response to these events, Mr. Early recommended training and testing upon entry and periodically thereafter on " 'shoot-don't shoot' live training under street conditions." Aplt.App. at 179. Prior to becoming district attorney, Mr. Early had been chief deputy district attorney for over ten years and had "nearly daily contact" with the Denver Police Department. Aplee. Supp.App. at 188. He had traveled and discussed law enforcement with many prosecutors, and he thought live "shoot-don't shoot" range training was important. *Id.* at 202. In addition, we note that Mr. Fyfe, who was qualified as an expert in police training on the use of deadly force and who was familiar with the program in place when Officer Spinharney was trained, stated his belief that failure to institute periodic live range training left Denver far below generally accepted police custom and practice, and constituted deliberate indifference to the rights of Denver citizens. "It's my opinion . . . that large departments like Denver's could not have avoided that kind of training or not offered that kind of training without being deliberately indifferent to situations like this. It's predictable in big cities that police officers will run into situations where they're going

5. On appeal, Denver argues that as a matter of law it can not be found deliberately indifferent because it had some "shoot-don't shoot" training, *see supra* at 739, and thus recognized the problem and was addressing it. In making this argument, Denver ignores the definition of deliberate indifference in *City of Canton:*

> Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As Justice Brennan's opinion in *Pembaur v. Cincinnati* [475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)], put it: "[M]unicipal liability under § 1983 attaches where—and only where—*a deliberate choice to follow a course of action is made from among various alternatives* " by city policymakers. Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by

our prior cases—can a city be liable for such a failure under § 1983.
. . . .
> *The issue in a case like this one . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."* It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But *it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.*

489 U.S. at 389–90, 109 S.Ct. at 1205 (citations omitted) (emphasis added). Thus, a city is deliberately indifferent if (1) its training program is inadequate, and (2) the city deliberately or recklessly made the choice to ignore its deficiencies.

to have to make judgments as to whether or not to shoot. And if they're not periodically trained and instructed on how to do that appropriately, they'll make mistakes." *Id.* at 277. This evidence is clearly sufficient to permit the jury reasonably to infer that Denver's failure to implement Mr. Early's recommendation on periodic live range training constituted deliberate indifference to the constitutional rights of Denver citizens.

■ Notwithstanding the above evidence, and the reasonable inferences favorable to plaintiffs which this evidence supports, Denver contends that it is entitled to judgment on this issue as a matter of law. It begins its argument with the faulty premise that "shoot-don't shoot" training is irrelevant to plaintiffs' claim, a proposition that we have rejected on the basis of *City of Canton v. Harris. See* Part II A *supra.* Denver further asserts that its training program was adequate as a matter of law, despite the evidence to the contrary that we set out in Part II C, *supra.* Relying on these two improper premises, Denver contends that plaintiffs presented no evidence to support a finding of deliberate indifference. In so doing, Denver again disregards the standards of review applicable to this appeal. When, as here, the evidence supports a reasonable inference favorable to the jury verdict, the fact that a contrary inference may also be drawn does not mandate the entry of j.n.o.v. "Only when 'the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom the motion is made' is j.n.o.v. appropriate." *EEOC v. University of Oklahoma,* 774 F.2d 999, 1001 (10th Cir.1985) (quoting *EEOC v. Prudential Fed. Sav. & Loan Ass'n,* 763 F.2d 1166, 1171 (10th Cir.1985), *cert. denied,* 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986)).

In sum, plaintiffs presented sufficient evidence to sustain the jury's determination that plaintiffs had established the four elements of their claim against Denver. Consequently, the trial court properly denied Denver's motion for j.n.o.v.

### III.

In the alternative, Denver argues that it is entitled to a new trial as a result of two evidentiary rulings by the trial court. First, Denver contends that the court erred in denying its motion to admit the official investigative report of the Zuchel shooting authored by Mr. Early. Second, Denver contends that the court erred in allowing Mr. Fyfe "to testify that police standards required Officer Spinharney to act contrary to constitutional limitations on the use of force." Aplt. Opening Br. at 40. These arguments are without merit.

### A.

Mr. Early wrote a report to the chief of police presenting the results of his investigation into Mr. Zuchel's death and explaining his decision as district attorney not to bring criminal charges against Officer Spinharney. The report concluded that Officer Spinharney's use of deadly force was legally justified under state law. In cross-examining Mr. Fyfe, Denver used this letter extensively and portions of it were read in front of the jury. Indeed, Mr. Early's conclusion that the shooting was justified under state law was read or paraphrased more than once. The first time Denver moved to admit the entire letter, plaintiffs' objection was sustained. Later during Mr. Fyfe's testimony, Denver again moved to admit the letter and the following discussion took place:

THE COURT: *Candidly, it's practically been read into evidence.*

[ATTORNEY FOR THE CITY]: That's the other reason I'm doing it.

THE COURT: I can't perceive the objection at this point.

[ATTORNEY FOR THE CITY]: I think in fairness to the jury, they ought to see the entirety, *since the majority has already been read into the record.*

. . . .

THE COURT: [The City] can't be offering it for the truth of the matters asserted because there is a lot of things in here that speak to matters which were testified to by witnesses.

[ATTORNEY FOR PLAINTIFFS]: That's precisely the things that we had objection to before, was the—it's for the jury to make the determination whether the shooting was justified, not Mr. Early or this witness—

THE COURT: All right. I'll make a compromise with you. You go ahead and finish up with this witness and then I'll rule on this.

Aplee.App. at 348–49 (emphasis added).

■■■ We have no indication in the record before us that the court ever ruled on the admissibility of the letter after Mr. Fyfe finished testifying, or that Denver ever requested the court to do so. Consequently, we have no ruling to review. Even if we were to conclude that the issue has been preserved for appeal, and that the court's failure was an abuse of discretion, we would hold that any error did not affect Denver's substantial rights. *See United States v. Drake,* 932 F.2d 861, 867 (10th Cir.1991). Virtually the entire contents of the letter were already before the jury. Mr. Early's assessment of the shooting had been repeatedly read into the record. Moreover, the circumstances of the incident set out in the letter, which recited the eyewitness accounts most favorable to Denver, had also been presented to the jury. Under these circumstances, admission of the letter itself would have added nothing and Denver therefore could not have suffered any prejudice because it was not formally admitted.

### B.

■■■ The contours of Denver's argument with respect to Mr. Fyfe are not entirely clear to us, but Denver apparently is attempting to bring Mr. Fyfe's testimony within the ambit of *Specht v. Jensen,* 853 F.2d 805 (10th Cir.1988) (en banc), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989). In that case, we held that the district court committed reversible error in allowing an attorney/expert witness to offer an "array of legal conclusions touching upon nearly every element of the plaintiff's burden of proof." *Id.* at 808. We stated that "when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case." *Id.* at 810. However, we emphasized that the line we were drawing was narrow, recognizing that "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Id.* at 809. "[A]n expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function." *Id.* at 809–810.

We point out initially that in attempting to apply *Specht* to the instant case, Denver fails to recognize that a factor we held critical in *Specht* is missing here. The expert in *Specht* was an attorney and his area of expertise was constitutional law. "There is a significant difference between an attorney who states his belief of what law should govern the case and any other expert witness." *Id.* at 808. Here, in contrast, Mr. Fyfe had a doctorate in criminal justice and was an expert in police training, tactics, and the use of deadly force. Courts generally allow experts in this area to state an opinion on whether the conduct at issue fell below accepted standards in the field of law enforcement. *See, e.g., Samples v. City of Atlanta,* 916 F.2d 1548, 1551–52 (11th Cir.1990); *see also Wade v. Haynes,* 663 F.2d 778, 783–84 (11th Cir. 1981) (expert in prison policy allowed to give opinion on whether conduct was prudent prison administration), *aff'd sub nom. Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *cf. United States v. Myers,* 972 F.2d 1566, 1577–78 (11th Cir. 1992) (lay witness allowed to testify on whether use of force reasonable or justified), *cert. denied,* —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993).

Denver argues that Mr. Fyfe's testimony was improper under *Specht* because, in testifying that Officer Spinharney's use of deadly force was inappropriate, Mr. Fyfe instructed the jury on the applicable law. However, Mr. Fyfe did not give an opinion on whether Officer Spinharney's conduct was unconstitutional. Rather, he stated his belief that the conduct was inappropriate "based on [his] understanding of generally accepted police

custom and practice in Colorado and throughout the United States." Aplee. Supp.App. at 249. Our review of Mr. Fyfe's testimony confirms that he stated his views only on whether Officer Spinharney's conduct violated standard police practices either during the moments preceding the shooting or at the time he pulled the trigger. Indeed, counsel for Denver clarified that Mr. Fyfe was "expressing an opinion not in terms of what would be allowed to a police officer under state or constitutional law but what you feel should be allowed as you interpret practices." *Id.* at 295.

It is apparent from the record that the trial court was completely familiar with *Specht* and was careful not to infringe on its parameters. In the midst of Mr. Fyfe's testimony, the court instructed the jury that "[w]hat the law is with regard to the use of force will be contained in the instructions I give you." *Id.* at 222. Mr. Fyfe's testimony fell well within the type of expert testimony recognized in *Specht* as permissible. *See* 853 F.2d at 809.

■ Denver also contends the district court erred in allowing Mr. Fyfe to testify that under accepted police practices Officer Spinharney should have used options other than deadly force. This argument is flawed in two respects. First, Denver asserts that Mr. Fyfe agreed Officer Spinharney reasonably perceived a threat of deadly force from Mr. Zuchel. As we have noted above however, *see* note 2 *supra*, in giving this opinion Mr. Fyfe was asked to assume the version of the facts most favorable to Officer Spinharney. In evaluating a motion for j.n.o.v., we instead must adopt that version of the evidence most favorable to the nonmoving party. Under this version of the facts, Mr. Zuchel did not pose a deadly threat. Second, Denver argues that because Officer Spinharney was under no legal duty to retreat when faced with allegedly deadly force, Mr. Fyfe's testimony on the propriety of using other options redefined the law. As we have pointed out, however, Mr. Fyfe testified that resort to other options was required *not* by state law but by generally accepted police practices. Accordingly, we reject Denver's

argument that reversal is required under *Specht.*

## IV.

Following the jury verdict in their favor, plaintiffs requested attorneys fees pursuant to 42 U.S.C. § 1988 (1988). Denver responded to this motion by arguing that the number of hours submitted by plaintiffs' attorney should be reduced on several grounds and that the hourly rate proposed by plaintiffs' counsel was "fabricated." The district court made some minor reductions in the number of compensable paralegal hours but concluded that the hours spent by plaintiffs' counsel were reasonable. The court also rejected Denver's argument with respect to plaintiffs' requested hourly rate.

On appeal, Denver reasserts its challenge to the reasonableness of the number of hours and the hourly rate adopted by the trial court. It also contends that we must remand because the district court did not specifically respond to its allegations in holding that plaintiffs' requested hours and hourly rate were reasonable. We conclude that under the relevant case law, the district court's memorandum opinion is sufficient to provide a basis for appellate review, and we affirm the award itself.

■ Determining the amount of a fee award under section 1988 is a matter committed to the trial court's discretion, and we give "great weight" to that court's assessment of a proper fee. *Hall v. Western Prod. Co.*, 988 F.2d 1050, 1057 (10th Cir.1993). "This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). The trial court must nonetheless "provide a concise but clear explanation of its reasons for the fee award." *Id.*

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433, 103 S.Ct. at 1939. Accord-

ingly, we begin our consideration of the fee award by addressing Denver's challenge to the number of hours the trial court held to be reasonably expended by plaintiffs' counsel. Denver argues that because plaintiffs' claim against Officer Spinharney was settled prior to trial for a nominal sum that included attorneys fees incurred against him, all hours expended by plaintiffs' counsel that are attributable to this claim cannot be included in calculating the fee with respect to Denver. We reject this argument for two reasons.

■ First, the claim against Officer Spinharney required plaintiffs to establish that his use of force was not objectively reasonable. As set out in Part II *supra,* however, plaintiffs were likewise required to prove this same fact as one element of their claim against Denver. Even if Officer Spinharney had never been named as a defendant, therefore, plaintiffs' counsel would nonetheless have been required to expend the time and effort necessary to challenge the constitutionality of Officer Spinharney's conduct at trial.[6] Plaintiffs are therefore entitled to the hours reasonably expended in pursuing this claim.

Second, the Supreme Court has made clear that when, as here, two claims are interrelated and the plaintiff obtains excellent results on one of those claims, a fully compensatory fee should usually be awarded.

Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.

*Hensley,* 461 U.S. at 435 (citation omitted); *see also Whalen v. Unit Rig, Inc.,* 974 F.2d 1248, 1253 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993).

■ Denver also contends that the trial court should have reduced the number of hours attributable to plaintiffs' interrogatories, depositions and research, and that a remand is necessary because the trial court did not expressly address these assertions individually in determining that plaintiffs' claimed hours were reasonable. We rejected a similar argument in an analogous situation. In *Mares v. Credit Bureau of Raton,* 801 F.2d 1197 (10th Cir.1986), the plaintiff asserted that the trial court committed legal error by making a wholesale reduction in hours

---

**6.** Denver makes much of the fact that plaintiffs settled with Officer Spinharney on the eve of the trial, contending that plaintiffs could have and should have settled earlier and avoided the expenses involved in defending against Officer Spinharney's qualified immunity proceedings. However, the pleadings below reveal that when Denver made this argument to the trial court, plaintiffs responded by pointing out that their decision to settle was made only after the Magistrate Judge accepted Denver's recommendation to bifurcate its trial from that of Officer Spinharney.

In this case, the Defendant filed a motion to bifurcate the trials of defendants Spinharney and the City. Magistrate Borchers recommended to Judge Sparr that he require the plaintiffs to first prove their case against Officer Spinharney, incurring all of the costs and undergoing all of the risks in doing so. Such a scenario was fraught with significant 'downside' potential (risks of low verdict, finding of 'good faith', two trials, no additional money) without any 'upside' potential.

It must be noted that this strategic decision was reached only after Plaintiffs were confronted with the prospect of two trials instead of one.

Aplt.App. at 165.

We also note that the only question at issue in the appeal of the district court's denial of qualified immunity was whether "genuine issues of material fact preclud[ed] a judicial determination of whether Officer Spinharney's conduct was objectively reasonable." *Zuchel v. Spinharney,* 890 F.2d 273, 275 (10th Cir.1989). As we point out in text *infra,* the reasonableness of Officer Spinharney's conduct is an element of the claim against Denver for which the parties needed to prepare in any event.

rather than providing a detailed explanation of hours reasonably attributable to individual tasks. We disagreed.

> There is no requirement, either in this court or elsewhere, that district courts identify and justify each disallowed hour. Nor is there any requirement that district courts announce what hours are permitted for each legal task. Such a rule would lead for disagreement of the most odious sort between court and counsel.
>
> No objective standard exists to resolve a dispute, for example, over ten hours logged for drafting interrogatories. A lawyer may insist the time was necessary, while a court, based upon experience and judgment, including knowledge of the case itself, may declare half the time to have been unnecessary. Under the theory proposed by plaintiffs' counsel, dozens of subsidiary questions then arise. Was the lawyer interrupted while drafting? Was the draft in longhand or dictated? Did the lawyer use previous forms on a word processor? Was research necessary? Were, for example, fourteen of thirty interrogatories really necessary? Is the lawyer a slow thinker, a poor writer (occasioning many drafts), or harassing the opposition for tactical purposes?
>
> As we stated, such inquiries would quickly become odious. The process would descend to a contest between court and counsel, with counsel insisting that his or her integrity is being impugned every time the court questions the number of hours logged for a given day or a particular task. And, such a process would still not result in a product free of dispute. To the contrary, disputes would be multiplied, violating the Supreme Court's caution that a "request for attorney's fees should not result in a second major litigation."

*Id.* at 1202–03 (citations omitted) (quoting *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941); *see also Smith v. Freeman,* 921 F.2d 1120, 1123–24 (10th Cir.1990). Our rationale in *Mares* applies to Denver's claim that the trial court is legally obligated to address each objection to hours claimed for particular legal tasks. As in *Mares* and *Smith,* the requirement Denver asks us to impose would produce the same undesirable results that we condemned in those cases.

The issue before us therefore is whether the trial court has provided a sufficient basis for review in explaining its determination that plaintiffs' claimed hours are reasonable. "The reasons do not, however, have to be so specific as to require individual justifications for each of the multipliers used in computing the lodestar figure so long as the reasons given for the award as a whole are adequate to allow for meaningful review." *Lucero v. City of Trinidad,* 815 F.2d 1384, 1385 (10th Cir.1987). The district court's order here explicitly describes Denver's objections to the hours claimed by plaintiffs' counsel. The order then sets out the law governing the award of fees under section 1988, referring specifically to the guidelines set forth in *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983), and stating: "The district court should also *examine* the total number of hours reported, *the hours allotted to specific tasks ...*" Aplt.App. at 170 (emphasis added). The court's order thus clearly indicates that the trial judge gave careful consideration to Denver's objections under the applicable law. Indeed, the court expressly agreed with Denver that the paralegal hours should be reduced. In otherwise accepting as reasonable the hours submitted by plaintiffs' counsel, the court stated:

> This case has been pending for over five years. It has involved challenging issues of law that have evolved with Supreme Court decisions during those five years. The trial court's denial of a motion for summary judgment based on qualified immunity was appealed by the Defendant to the Court of Appeals for the Tenth Circuit and affirmed. The case is now on appeal for a second time by the Defendant. In considering the amount of the preexisting contingent fee agreement, and in light of the length of this case, the complexity of the issues that arose, and the tenacity of defense counsel, the court concludes that the hours spent by Mr. Eldridge are reasonable.

*Id.* at 171. "We will disturb the trial court's determination only where there has been a clear abuse of discretion or where the court

provides no reasons for the award as a whole." *Lucero,* 815 F.2d at 1386. The trial court here provided reasons that are both legitimate and adequate to support its determination of the reasonable number of hours expended. Accordingly, we find no abuse of discretion.

■ We likewise find no merit in Denver's challenge to the court's determination of a reasonable hourly rate. "The establishment of hourly rates in awarding attorneys' fees is within the discretion of the trial judge who is familiar with the case and the prevailing rates in the area." *Id.* at 1385 (citation omitted). In setting the rate

> the court should establish, from the information provided to it and from its own analysis of the level of performance and skills of each lawyer whose work is to be compensated, a billing rate for each lawyer based upon the norm for comparable private firm lawyers in the area in which the court sits calculated as of the time the court awards fees.

*Ramos,* 713 F.2d at 555. In setting a reasonable hourly rate here, the court referred to "the affidavits of several local attorneys who are familiar with plaintiffs' work." Aplt.App. at 172.[7] In so doing, the court did not abuse its discretion, particularly when it "is uniquely qualified to establish the reasonable hourly rate multiplier in computing attorneys' fees." *Lucero,* 815 F.2d at 1386.

In sum, we conclude that the trial court's order provides an adequate basis for appellate review, and that it did not clearly abuse its discretion in making the fee determination. Accordingly, the award is affirmed.

### V.

■ The Zuchels cross-appeal the trial court's refusal to award them prejudgment interest. The award of prejudgment interest under federal law "is to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of judgment." *U.S. Indus., Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1256 (10th Cir.1988). Although pre-

judgment interest is ordinarily awarded in a federal case, it is not recoverable as a matter of right. *Id.* Rather, such an award "is governed by a two step analysis. First, the trial court must determine whether an award of prejudgment interest would serve to compensate the injured party. Second, when an award would serve a compensatory function, the court must still determine whether the equities would preclude the award of prejudgment interest." *Id.* at 1257; *Eastman Kodak Co. v. Westway Motor Freight, Inc.,* 949 F.2d 317, 321 (10th Cir.1991).

"We must uphold a district court's determination of prejudgment interest unless there is an abuse of discretion." *Eastman Kodak,* 949 F.2d at 321. Here, the district court's order shows that it evaluated the propriety of awarding prejudgment interest under the proper two-part test, addressing both the compensatory aspect and the equities. We have carefully considered the trial court's analysis, and we conclude that the court did not abuse its discretion in denying the award.

### VI.

In sum, we affirm the trial court's denial of Denver's j.n.o.v. motion. We also reject Denver's alternative argument that it is entitled to a new trial. We affirm the trial court's award of attorneys fees under section 1988, and we affirm the denial of prejudgment interest.

AFFIRMED.

### APPENDIX

February 14, 1983

Chief Art Dill
Denver Police Department
1331 Cherokee Street
Denver, Colorado 80204

Dear Chief Dill:

This letter is written in the spirit of cooperation, not criticism. The comments and suggestions contained herein are neither in-

---

**7.** Denver argues that the court erred in considering this evidence. In so doing, Denver uses unsupported factual assertions and an *ad hominem* attack that are entirely inappropriate.

tended to make the job of a police officer more difficult nor diminish the value of citizens' lives. If my office can be of any assistance in implementing or refining any portion of the suggestions contained herein, you have my full support.

Since the beginning of this year, there have been five instances in which citizens have been injured or killed by peace officers, and one in which an officer was seriously injured. The circumstances vary greatly but point to the need for meaningful reflection and action by both citizens and law enforcement personnel. We must not only attempt to prevent violent confrontations between citizens and police but also try to learn something from each one. To be of maximum effectiveness, we need a concerted effort from citizens, police, and district attorneys. While no officer relishes facing a situation that is likely to result in his death, that of his partner, or a citizen, I am sure that each one wants to be fully equipped to make the very best decision when the situation arises.

Although the great majority of shootings by peace officers in Denver are clearly legally justified, some raise questions that the District Attorney's office does not have the statutory authority to resolve. However, they can be addressed by the Denver Police Department. As I mentioned in my letter regarding the death of Samuel Carter, issues concerning the background and prior conduct of the involved officer; prior involvement in police shootings; soundness of judgment and strategic decisions leading up to the shooting; appropriateness of the degree of force used; number of shots fired; and many others fall into this category.

Common sense, sound judgment, good faith, fairness and professionalism are the five traits that are critical to proper use of physical and deadly force. Officers who by their conduct have displayed inadequacy in these areas should be assigned to positions that minimize their exposure to these situations. National surveys of shootings by peace officers show that the Denver Police Department is far from being "trigger happy." In fact, Denver is right at the mean for peace officer-related deaths. With the high level of professionalism displayed by the overwhelming majority of Denver police officers, there is no reason why Denver cannot become a model for others to follow.

Toward that end, I submit to you for your consideration and review the following suggestions for strengthening our effort in this vital area. I recognize that some of these suggestions deal with items which are already in place within the Denver Police Department. In such instances, my suggestion would be that some attention be given to expanding their use.

1. Training upon entry and periodically thereafter.

   A. Strategic skills development; how to analyze situations, develop options, and select the option that minimizes the likelihood of a violent confrontation.

   B. Periodic target course "shoot-don't shoot" live training under street conditions, particularly for officers on the front line.

   C. Ongoing physical conditioning and training in arrest and defense techniques to ensure proper safety and reduce the likelihood of escalating force.

   D. Street survival.

   E. Law relating to the use of force.

   F. Individual case training at rollcalls.

2. Testing upon entry and periodically thereafter.

   A. Written testing on law and procedures.

B. Use of firearms.

C. Target course shoot-don't shoot.

D. Judgment and strategic skills.

E. Stress testing.

Scores on these tests should have some impact on assignment (particularly to high contact positions).

3. Personnel deployment.

A. Appropriate assignment of officers who are deficient in the essential traits of common sense, sound judgment, fairness, good faith, and professionalism.

B. Reassignment for protection of officer, his partner, and the public.

(Studies have confirmed that some officers, after having been involved in a shooting incident, become reluctant to enter another situation which could result in another shooting. Citizens' lives and officers' lives have been lost as a result.)

4. Public education regarding use of force.

A. Media education.

B. Schools.

C. Community groups.

5. Internal departmental firearms discharge review board.

A. Other such boards from around the country could be drawn on in designing the best approach in Denver.

B. A major purpose would be to analyze past shootings in order to improve future performance.

C. Revise firearms discharge policies when appropriate.

6. Post-shooting support program. (To include, but not limited to, stress testing, individual and group counselling.)

A. Officer.

B. Officer's family.

C. Party shot.

D. Family of party shot.

As I stated previously, some of these are already in place. Others are not. All could benefit from review and coordination to ensure maximum effectiveness.

As you know, there is one very important additional ingredient necessary to reduce the incidents of shootings by peace officers. That ingredient is the assistance of the citizens of Denver. Citizens must try to understand the inherent difficulties and dangers faced by peace officers in their daily work and seek to reduce tensions through cooperation, rather than increase them through confrontation; they must obey commands by peace officers and seek redress later if they feel they have been wronged; and they must stop committing violent crimes with deadly weapons. As District Attorney and as a citizen, I request the assistance of you and your department in making every effort to take appropriate steps to minimize the use of force while still performing the police function and protecting your officers and the citizens of Denver.

Again, I commit to you my staff and resources to work toward that end. Shootings by peace officers cannot be eliminated, because peace officers, like all citizens, have a right to defend themselves and there will always be those persons in our society who have no respect for human life. But shootings by peace officers can be minimized through the collective efforts of governmental leaders, peace officers and citizens. Working together, we can make progress in this area of concern and consequence to us all.

Very truly yours,
Norman S. Early, Jr.
Aplt.App. at 178–80.