*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0087P (6th Cir.)
File Name: 04a0087p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOSEPH GADDIS, by his next
friend and guardian, Erma
Gaddis,

    *Plaintiff-Appellant,*

    *v.*

REDFORD TOWNSHIP, a
municipal corporation; CITY
OF DEARBORN HEIGHTS, a
municipal corporation;
MATTHEW BAIN, in his
official and individual
capacities; JOHN BURDICK, in
his official and individual
capacities; RICHARD
DUFFANY, in his official and
individual capacities, jointly
and severally,

    *Defendants-Appellees.*

No. 02-1483

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 00-40375—Paul V. Gadola, District Judge.

Argued: September 17, 2003

Decided and Filed: March 26, 2004

Before: BOGGS, Chief Judge; and KRUPANSKY and
CLAY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Mark R. Bendure, BENDURE & THOMAS,
Detroit, Michigan, for Appellant. Joseph Nimako,
CUMMINGS, MCCLOREY, DAVIS & ACHO, Livonia,
Michigan, Eric D. Smith, HOPKINS, CURRAN & SMITH,
Southfield, Michigan, John H. Dise, Jr., DISE &
ASSOCIATES, Southfield, Michigan, for Appellees.
**ON BRIEF:** Mark R. Bendure, BENDURE & THOMAS,
Detroit, Michigan, Justin C. Ravitz, SOMMERS,
SCHWARTZ, SILVER & SCHWARTZ, Southfield,
Michigan, for Appellant. Joseph Nimako, CUMMINGS,
MCCLOREY, DAVIS & ACHO, Livonia, Michigan, Eric D.
Smith, Christine A. Fischer, HOPKINS, CURRAN &
SMITH, Southfield, Michigan, John H. Dise, Jr., DISE &
ASSOCIATES, Southfield, Michigan, for Appellees.

BOGGS, C. J., delivered the opinion of the court, in which
KRUPANSKY, J., joined. CLAY, J. (pp. 25-40), delivered
a separate dissenting opinion.

───────────────

## OPINION

───────────────

BOGGS, Chief Judge. Joseph Gaddis, a mentally ill man
proceeding by his next friend, appeals from the district court's
grant of summary judgment to the defendants in his 42 U.S.C.
§ 1983 action. Mr. Gaddis claims that the individual
defendants, members of two Michigan municipal police
departments, violated his Fourth Amendment rights by

stopping his car without justification, and by using excessive force in an ensuing confrontation that culminated in two officers shooting Gaddis. The district court concluded that Gaddis had failed as a matter of law to show that the defendants violated his constitutional rights. For the following reasons, we affirm.

## I

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In our *de novo* review of the district court's grant of summary judgment, we must resolve disputes of fact in favor of the nonmoving party, Gaddis, drawing all reasonable inferences in his favor. *Burchett v. Kiefer*, 310 F.3d 937, 941-42, 945 (6th Cir. 2002). The application of this standard is complicated here by the fact that Gaddis, the only witness to the events at issue apart from the defendant officers and their colleagues, has been stipulated incompetent to testify due to mental illness. As discussed below, the record on appeal includes a videotape that captured many of the events at issue. We have carefully examined this tape along with the witnesses' testimony in reviewing the district court's judgment.

## II

Gaddis's encounter with the police began shortly before 4:00 a.m. on April 12, 1999, in Redford Township, Michigan. Defendant Matthew Bain, a Redford Township officer, spotted Gaddis's car while patrolling alone on Telegraph Road. (The mounted video camera on Officer Bain's patrol car yielded the tape that is the chief visual record of the encounter. However, because the car's audio recording system was not working, the tape is silent.) Bain saw Gaddis weaving within the right lane: his car edged to the left to touch the divider line twice in a few hundred feet. Bain testified that Gaddis was also driving somewhat slowly, and

the tape tends to confirm this, as it shows other cars passing Gaddis to the left on the sparsely trafficked road.

Bain also testified that he saw Gaddis slumping to the right inside his car as he held the wheel. The videotape neither reinforces nor throws doubt on this testimony. The interior of the car is dark on the tape and Gaddis's posture cannot be made out, but the resolution of the video image is not high, and the camera's point of view is slightly different from the vehicle driver's. Bain pulled up alongside Gaddis's car and confirmed to his satisfaction that Gaddis was leaning to the right, toward the passenger's seat. Bain testified that he suspected Gaddis was driving while intoxicated, a crime in Michigan. *See* Mich. Comp. L. § 257.625.

Bain pulled behind Gaddis's car and turned on his flashers and siren. When Gaddis failed to stop, Bain also employed his air horn. Gaddis kept driving until he reached a red light. Bain then left his patrol car and approached Gaddis's stopped auto on foot. When the light changed to green, Gaddis turned right and drove away. Bain ran back to his car and pursued Gaddis again, and finally succeeded in pulling him over after about a block.

Bain left his car again and walked over to Gaddis's car. The officer had his sidearm drawn when he stepped out of the car, but holstered it as he walked up to Gaddis's driver side window. Bain asked Gaddis for his license and registration, to which Gaddis replied that his license was suspended (which turned out not to be true), and handed Bain an expired Michigan driver's license. By this time a number of other uniformed police officers had arrived on the scene, including Dearborn Heights Officers John Burdick and Richard Duffany, who had been eating at a nearby restaurant and decided to assist Bain after hearing him drive by in pursuit of Gaddis.

Bain told Gaddis to get out of the car. Gaddis opened the door and stepped out with his hands inside his pockets. Bain

testified that he ordered Gaddis to remove his hands from his pockets. The tape shows that shortly after Gaddis emerged, Bain grabbed him by the collar and pulled him slightly away from the car. Gaddis then removed his hands from his pockets, prompting a dramatic reaction: Bain jumped back, visibly alarmed, and he and the other officers drew their sidearms, pointing them at Gaddis. Officers Bain and Burdick later testified that Gaddis had a knife in his hand, while Duffany saw something shiny but wasn't sure what it was. (The videotape image does not permit the viewer to verify directly whether Gaddis was holding a knife, a point we will discuss further in Part IV of this opinion.) At about this time a fourth officer arrived on the scene, Officer Champoux of the Redford Township department. Champoux pointed a shotgun at Gaddis, but testified that he could not tell if Gaddis had anything in his hand.

There ensued a standoff of two to three minutes' duration. The officers testified that they told Gaddis repeatedly to drop his knife, and that Gaddis said something incoherent to Bain along the lines of: "Why are you doing this to me, Chris, like you did to me in California?" None of the officers was named Chris or had ever encountered Gaddis in California. Bain later testified that the "Chris" remark suggested to him that Gaddis was not acting rationally. Officer Burdick testified that he did not hear the remark. On the tape, Gaddis can be seen apparently speaking to the officers during the standoff. He gestures with his hands, but keeps them fairly low at his side.

Gaddis then stated that he wanted to leave.[1] Bain stepped forward and sprayed Gaddis in the face with pepper spray. Meanwhile, Officer Burdick had been walking around to the passenger side of Gaddis's car. Seconds after Bain used the pepper spray, Burdick clambered over the trunk of Gaddis's

---

[1]Officer Champoux later testified that he believed he could have blocked Gaddis's car with his own patrol car if Gaddis had tried to leave.

car and tried to grab Gaddis. Gaddis reacted violently: he wheeled and struck at Burdick with his right, then his left hand. Gaddis's right-handed strike was a windmilling motion arguably suggestive of an attempt to stab with a knife. Bain and Duffany testified that they saw Gaddis stab at Officer Burdick with a knife. They both began shooting, firing a total of 16 shots at Gaddis in a single burst. Burdick first heard the shots as he was falling backward over the back of Gaddis's car. Gaddis was struck in the torso, right arm, buttocks, and left thigh, and fell to the ground. Champoux did not fire.

Evidence technicians recovered a knife from the street near Gaddis's car, but did not fingerprint it.

Gaddis was charged with assault with intent to murder and with fleeing and eluding police. On June 8, 1999, he was found guilty in a bench trial of felonious assault (a lesser included offense), and not guilty on the fleeing count. Pursuant to a post-trial motion, however, Gaddis was later adjudged not guilty of the felonious assault charge as well.

Gaddis filed suit under 42 U.S.C. § 1983 against Officers Bain, Burdick, and Duffaney, alleging that they illegally detained him and used excessive force against him in violation of the Fourth Amendment. (He also asserted a claim of discrimination on the basis of his race and his mental illness, which he has abandoned on appeal.) He also sued the municipalities of Redford Township and Dearborn Heights, claiming that they maintained unlawful policies that caused the incident.

Plaintiff introduced the affidavit of James Fyfe, Ph.D., a former police officer and a professor of criminal justice. Prof. Fyfe opined that the officers unreasonably deviated from proper police techniques for dealing with emotionally disturbed persons ("EDPs"). In particular, he testified that officers using correct police techniques would recognize that "techniques of intimidation and force" are not likely to work on EDPs in the way they may work on rational persons. He

testified that the police should instead have picked a single officer to talk calmly to the EDP, and should have refrained from unnecessary displays of force. Fyfe criticized Bain's use of pepper spray, and described Burdick's attempt to tackle Gaddis by surprise from behind as a "terrible tactic."

The defendants moved for summary judgment, and the district court granted summary judgment on all claims on February 20, 2002. While the individual defendants had all raised the defense of qualified immunity, the district court did not reach the qualified immunity issue, but held that the defendants were entitled to summary judgment on the merits. *Gaddis v. Redford Township*, 188 F. Supp. 2d 762 (E.D. Mich. 2002).

As to Gaddis's claim that the initial stop of his car was unlawful, the court held that reasonable suspicion was all that was required to justify an investigative stop of a car. *Id.* at 768. It further held that Gaddis's weaving in the lane and leaning over the seat provided reasonable suspicion. Indeed, it stated that the weaving, "simpliciter," would be enough to establish reasonable suspicion. *Id.* at 768-69.

As to the excessive force claim, the district court held that there was no genuine issue of material fact as to whether the officers' use of force was reasonable. *Id.* at 772. It reasoned that the threat posed by Gaddis was quite high, as he had stabbed Officer Burdick. *Id.* at 770. The court also concluded that the officers' "overall handling of the incident" did not violate the Fourth Amendment. *Id.* at 770-72. It noted that the "officers fired only one volley at Plaintiff, and . . . did so immediately after Plaintiff had stabbed a policeman." *Id.* at 771. The "uncontested evidence" showed that "when the police shot Plaintiff, he had just stabbed Defendant Burdick, still appeared to be holding a knife, and was in close proximity to Defendant Burdick." *Id.* at 772. The court also rejected Gaddis's equal protection claims. *Ibid.*

Gaddis timely appealed to this court, appealing only the grant of summary judgment on his Fourth Amendment claims.

### III

The first issue is whether the initial stop of Gaddis's car violated the Fourth Amendment.

### A

At the outset, we must determine the legal standard that governs a brief stop of a car for suspected drunk driving in a jurisdiction where, as in Michigan, such conduct is a criminal offense. *See* Mich. Comp. L. § 257.625(9)(a) (defining driving while intoxicated as a misdemeanor punishable by imprisonment). Unfortunately, this proves to be a complicated question, because different published opinions of this court have given inconsistent answers at different times.

By contrast, the Supreme Court has not wavered in this area. It has consistently articulated a clear governing rule: when officers have reasonable suspicion that occupants of a vehicle are engaged in criminal activity, they may briefly stop the vehicle to investigate. *E.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Alabama v. White*, 496 U.S. 325, 328-32 (1990); *United States v. Hensley*, 469 U.S. 221, 226 (1985).

This court's earlier case law was consistent with this teaching. In *United States v. Roberts*, 986 F.2d 1026 (6th Cir. 1993), we held that police may perform an investigatory stop of a vehicle when they have reasonable suspicion that the occupant is committing the crime of drunk driving. *Id.* at 1029-30.

However, two later cases potentially departed from this standard. Both arose in Tennessee, where, as in Michigan, driving while intoxicated is a crime. In *United States v.*

*Palomino*, 100 F.3d 446 (6th Cir. 1996), the court upheld the stop of a vehicle where police had grounds to suspect both drunk driving[2] and the traffic violation of failure to stay within lanes.[3] *Id.* at 448-49. Palomino argued that the stop was pretextual. He claimed that police had really stopped his car because he was Mexican and fit certain characteristics of a drug courier profile. *Id.* at 448. The court held that even if true, this was irrelevant, because the police "ha[d] probable cause to believe that a traffic violation had occurred," justifying the stop. *Ibid.* This reasoning, while otherwise unexceptionable, could be read to lump criminal drunk driving together with failure to stay in lanes as a "traffic violation." *Ibid.*

*Palomino* cited as authority the Supreme Court's then-recent decision in *Whren v. United States*, 517 U.S. 806 (1996). *See* 100 F.3d at 448. The cautiously worded opinion in *Whren* was consistent with the result in *Palomino*, but it did not support a general requirement of probable cause for stops based on suspicion of *any* offense, criminal or otherwise, involving a vehicle. *Whren* simply held that, when a defendant argued that his vehicle was stopped for improper reasons on the pretext of violating a traffic regulation, the officer's improper motivations would not render the stop a violation of the Fourth Amendment if "the police ha[d] probable cause to believe that a traffic violation had occurred." 517 U.S. at 810. *Whren* did not involve a criminal offense. Rather, the defendants were stopped for speeding and failing to signal a right turn, in violation of municipal regulations. *Ibid.*[4]

---

[2]*See* Tenn. Code Ann. § 55-10-401.

[3]*See* Tenn. Code Ann. § 55-8-123.

[4]Indeed, *Whren* did not even hold that all stops premised on a civil traffic violation require probable cause – only that if police *do* have probable cause, then any claim of pretext is irrelevant for Fourth

Our published decisions following *Palomino* contained no suggestion that *Palomino* had abrogated the bedrock rule permitting an investigatory vehicle stop when there is reasonable suspicion of a crime. *See Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999) ("Police may briefly stop an individual for investigation if they have a reasonable suspicion that the individual has committed a crime. . . . The same Fourth Amendment test applies to vehicle stops.") (punctuation omitted) (citing, *inter alia*, *Palomino*, 100 F.3d at 449).[5]

However, four years after *Palomino*, a panel of this court decided *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000), which held that Tennessee police were not justified in stopping the defendants' mobile home after watching the vehicle veer out of its lane on a windy day. 209 F.3d at 465-66. The court held that this behavior was insufficient to justify a stop, whether it was viewed as evidence of failure to stay in lanes, *or* as evidence of drunk driving, which was a crime, though the court's opinion did not discuss the violation/crime distinction. *Ibid.* At one point, the court

---

Amendment purposes.

However, as the dissent points out, this court's opinion in *United States v. Ferguson*, 8 F.3d 385 (6th Cir. 1993) (en banc), which rejected a "pretextual stop" challenge like the one in *Whren*, went on to state that probable cause would be necessary for a stop premised on a civil traffic violation. *See id.* at 391 ("We hold that so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment. . . . If an officer testifies . . . that he . . . did not have probable cause to believe a violation had occurred . . . [s]uch a stop would be unreasonable under the Fourth Amendment.").

[5]*See also United States v. Huguenin*, 154 F.3d 547, 557 (6th Cir. 1998) ("[T]he Supreme Court emphasized . . . in *Whren* . . . [that] there is a significant difference between a pretextual stop based on probable cause that a traffic violation has occurred, and a stop that is not based on probable cause *or even reasonable suspicion*") (emphasis added).

specifically stated that the police were not justified in stopping Freeman for drunk driving because his weaving path "did not give [the officers] . . . *probable cause* to stop the motor home." 209 F.3d at 467 (emphasis added). Gaddis argues that *Freeman* is now the law of the circuit, and requires probable cause to stop a car for suspicion of criminal drunk driving. *Freeman* appears to conflict with our earlier decision in *Roberts,* as well as our many decisions, such as *Houston*, which affirm the bedrock rule that reasonable suspicion of a crime justifies a brief stop.

We have a settled procedure for resolving cases of intra-circuit conflict. "[A] panel of this [c]ourt cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001).

*Roberts* squarely held that a stop for criminal drunk driving requires only reasonable suspicion. As the earliest decision on point, it must control, unless the intervening Supreme Court decision in *Whren* "require[d] modification" of its holding by a later panel. We do not read *Palomino* as so holding. At most, *Palomino* held that probable cause was *sufficient* to justify a stop for drunk driving, not that probable cause was *necessary* for such a stop. *See* 100 F.3d at 448-49. Nor did *Freeman* purport to modify past precedent in light of *Whren*; indeed, *Freeman* did not even cite *Whren* or *Palomino*. *See* 209 F.3d at 466-67.

Thus, at a minimum, applying the *Darrah* rule to our precedents yields grave doubt about the current authority of *Freeman*. Any lingering questions are resolved by the Supreme Court's intevening decision in *Arvizu*, which explicitly reaffirmed the traditional rule that police may make "brief investigatory stops of . . . vehicles . . . if the officer's action is supported by reasonable suspicion to believe that

criminal activity may be afoot." 534 U.S. at 273 (punctuation omitted); *accord Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003).

We therefore hold that a standard of reasonable suspicion governs the stop of Gaddis's vehicle for suspicion of driving while intoxicated. This conclusion is also consistent with extensive authority from other circuits. *E.g.*, *United States v. Sanchez-Pena*, 336 F.3d 431, 436 & n.2 (5th Cir. 2003); *United States v. Colin*, 314 F.3d 439, 442, 444 (9th Cir. 2002); *United States v. Wheat*, 278 F.3d 722, 727-29 (8th Cir. 2001); *see also United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003) ("a [vehicle] stop is a constitutional detention if it is justified by reasonable suspicion under *Terry* or probable cause to believe a traffic violation has occurred").[6]

---

[6] In the hope of providing guidance to the district courts in this circuit, we summarize the state of our Fourth Amendment jurisprudence on vehicle stops.

Police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor, including drunk driving in jurisdictions where that is a criminal offense. *Arvizu*, 534 U.S. at 273; *Shadoan*, 340 F.3d at 407; *Roberts*, 986 F.2d at 1029-30. Police may also make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor. *Hensley*, 469 U.S. at 229; *Roberts*, 986 F.2d at 1030.

Next, police may make a stop when they have probable cause to believe a civil traffic violation has occurred, even if the defendant raises a claim that the stop was pretextual. *Whren*, 517 U.S. at 810; *Palomino*, 100 F.3d at 448; *Ferguson*, 8 F.3d at 391. Whether they may also stop a vehicle based on mere reasonable suspicion of a traffic violation is the subject of another conflict in our case law. *Compare Shadoan*, 340 F.3d at 407-08 (upholding stop where police had "reasonable suspicion" of a violation of vehicle registration and window tinting regulations) *with Freeman*, 209 F.3d at 466 (invalidating stop where police lacked "probable cause" to stop vehicle for failure to stay in lane); *and Ferguson*, 8 F.3d at 391 (stating in *dictum* that probable cause is required for a stop premised on traffic violation).

Gaddis's case does not require us to resolve this last issue. We note, though, that the issue appears to be controlled by *Freeman,* the earlier

**B**

Measured by the standard of reasonable suspicion, the stop was constitutional. Reasonable suspicion to stop a vehicle depends on a contextual inquiry that considers, in the well-known phrase, "the totality of the circumstances – the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Here, Gaddis weaved twice to the left to touch the dividing line in a fairly short span. Bain's testimony that Gaddis was leaning over to the right inside his car must also be accepted for summary judgment purposes, because it was uncontradicted by other testimony and the videotape does not tend to contradict it.[7]

These facts establish reasonable suspicion of drunk driving. Indeed, the Tenth Circuit held an investigatory stop for drunk driving justified on comparable facts in *United States v. Ozbirn*, 189 F.3d 1194 (10th Cir. 1999), where an officer saw the defendant's motor home "drift onto the shoulder twice within a quarter mile without any adverse circumstances like road or weather conditions to excuse . . . the deviation." *Id.* at 1199. Gaddis argues that our analysis should be controlled by *Freeman*, discussed above, and *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996), which held that officers did not obtain a reasonable suspicion of drunk driving when they witnessed the defendant's truck veer once in to the right emergency lane of the interstate. *Id.* at 975-76, 978-79. However, both cases are readily distinguished. In both *Freeman* and *Gregory*, the suspect vehicle swerved only

_____

panel holding on point, a conclusion reinforced by this court's embrace of the probable cause requirement for traffic violations in *dictum* its *en banc* opinion in *Ferguson*. *See Darrah*, 255 F.3d at 309.

[7]It is also modestly relevant that Gaddis was driving slowly compared to the other traffic. While this fact is obviously capable of many innocent explanations, it nevertheless contributes to the overall picture created by the other evidence of drunk driving. *See Arvizu*, 534 U.S. at 277.

once, and there were no other significant facts to suggest drunk driving.

Thus, summary judgment for all defendants was proper as to the legality of the initial vehicle stop.

**IV**

The more difficult issue in this case is the legality of the various officers' uses of force in their confrontation with Gaddis. The sole constitutional standard for evaluating excessive force claims is the Fourth Amendment's criterion of reasonableness. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Courts must apply an objective standard, looking to "the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) (quoting *Graham*, 490 U.S. at 396) (brackets added). At the same time, they must bear in mind that the Fourth Amendment "prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general." *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996) (quoting *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993)).

In this circuit, courts faced with an excessive force case that involves several uses of force must generally "analyze the . . . claims separately." *Ibid.* They should "identif[y] the seizure and procee[d] to examine whether the force used to effect *that* seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create those circumstances." *Id.* at 1161 (quotation marks omitted) (emphasis added). However, they may consider "the moments preceding [a] shooting" as part of the context of that shooting. *Id.* at 1162.

Here, Gaddis challenges four different events as constituting unreasonable force: Bain's initial shoving or handling of Gaddis as Gaddis emerged from his car; Bain's spraying of Gaddis as he stood in his car doorway; Burdick's almost simultaneous grappling of Gaddis; and the ultimate volley of 16 shots fired at Gaddis after he struck at Burdick. We consider these uses of force in turn.

### A

The district court did not examine Officer Bain's brief initial grab of Gaddis as the latter emerged from his car. However, we hold that this act was not unconstitutionally excessive force. Bain was dealing with a suspect who had previously refused to stop for police, suggesting that he might be disoriented or intent on avoiding arrest. Bain testified that he grabbed Gaddis because he wanted to keep him from fleeing and to perform a pat-down search on Gaddis, who had his hands in his pockets. The record cannot be construed to cast doubt on this claim. The Supreme Court has instructed that "the right to make an arrest or investigatory stop carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Ibid.* We acknowledge that even minor uses of force are unconstitutionally excessive if they are "totally gratuitous." *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988). Here, however, Bain's reasonable need to prevent Gaddis from fleeing and to discern whether he was armed justified his action.

### B

Before we consider the officers' later actions, we must decide whether the district court rightly held that there was no material dispute of fact on the critical question of whether Gaddis drew a knife from his pocket. If a reasonable jury could find that Gaddis did *not* have a knife, then it could

unquestionably go on to find that shooting him was unconstitutionally excessive force, *see Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (holding that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead"), and the grant of summary judgment would have to be reversed. The presence or absence of a knife also affects our analysis of the officers' uses of nonlethal force – Bain's decision to mace Gaddis and Burdick's attempt to grapple Gaddis from behind. We review de novo the district court's holding that no factual dispute existed. *Burchett v. Kiefer*, 310 F.3d 937, 941-42 (6th Cir. 2002).

Since Gaddis could not testify, the only relevant evidence is the videotape and the testimony of the four officers. Bain and Burdick both testified that they saw a knife in Gaddis's hand; Officer Duffany testified that he saw something shiny in Gaddis's hand; and Officer Champoux, who was further from the scene, could not tell whether or not Gaddis had a knife. Bain saw a fairly small knife in Gaddis's hand; Burdick described it as a "large" knife. Only Bain's and Burdick's testimony could be said to conflict. This sort of minor conflict of perception is common, and is not sufficient by itself to create a material dispute of fact as to the officers' credibility.[8]

---

[8] As the Fourth Circuit observed about a similar evidentiary conflict:

In a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer. For that reason, minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point that of the officers. . . . Thus, the discrepancies between the officers' testimony and Williams's testimony about the positioning and speed at which Anderson was lowering his hands do not raise an issue of triable fact.

*Anderson v. Russell*, 247 F.3d 125, 130-31 (4th Cir. 2001).

Gaddis argues, however, that the inability to see a knife on the videotape does create such a material dispute of fact. Because this argument has some force, we will explain our reasons for rejecting it in some detail. The videotape image is of low quality. It readily discloses the movements and postures of Gaddis and the officers, but not the details of their appearances. Gaddis's hand is a vague blur. While the tape would not enable a juror to verify the presence of a knife by direct observation of Gaddis's hand, it equally would not permit the juror to conclude that there was no knife there. (If it did, summary judgment would obviously be inappropriate.) Instead, the viewer's sole clue is the body language of the actors during the encounter. And in this respect, the officers' reactions powerfully corroborate their testimony that Gaddis produced a knife. On the tape, when Gaddis removes his hands from his pockets, Bain jumps back in obvious alarm. He pulls out his service pistol and covers Gaddis with it, and the other officers follow suit. The reaction is inexplicable unless something threatening was in Gaddis's hands. In addition, Gaddis later uses a windmilling motion to strike at Burdick, which is suggestive of a knife stab. Thus the tape as a whole tends to reinforce the officers' testimony that there was a knife, not to contradict it.

All admissible evidence in the case points to the conclusion that the knife was present. At most, the poor quality of the tape might be said to raise a "scintilla of evidence" in support of Gaddis's position, but that is not enough to withstand summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). We conclude that there was no material dispute as to whether Gaddis had a knife.

## C

We turn next to Bain's decision to use pepper spray to try to incapacitate Gaddis. As noted before, after Gaddis drew his knife, there followed a standoff of about two minutes, during which Gaddis stood in the doorway of his car and the officers repeatedly ordered him to drop his weapon. During

this time Gaddis made an incoherent remark to Bain, calling him "Chris" and referring to a nonexistent prior confrontation with him in California. Gaddis then announced that he wanted to leave. It was at this point that Bain stepped forward and sprayed him. Gaddis argues that on the facts of this encounter, the use of pepper spray was unconstitutionally excessive.

One of the main purposes of nonlethal, temporarily incapacitating devices such as pepper spray is to give police effective options short of lethal force that can be used to take custody of an armed suspect who refuses to be lawfully arrested or detained. As a general matter, this court has expressed doubt "that the use of non-lethal force against an armed and volatile suspect constitutes excessive force." *Ewolski v. City of Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002).[9] Gaddis's case falls in or near this category: he was armed with a knife and his conduct was at least somewhat "volatile," as he was refusing to submit to arrest. Moreover, we have also held that in sufficiently pressing circumstances, officers may use pepper spray to take custody of unarmed suspects. In *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997), we upheld judgment as a matter of law for police officers who used spray to subdue an unarmed individual they feared would injure himself or commit suicide by overdosing on pills if not taken into custody. *Id.* at 1104-05. Of course, there must exist an objective justification for the use of pepper spray. In *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994), we held that police who repeatedly sprayed mace in the face of an unarmed plaintiff who was not resisting and

---

[9] *See also Russo*, 953 F.2d at 1044-45 (holding officer entitled to qualified immunity despite his using Taser gun multiple times on knife-wielding suspect who was no longer an immediate threat; noting that officer's "actions were intended to avoid having to resort to lethal force"); *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 315 (S.D.N.Y. 1998) (dismissing excessive force claim against officer who used a single stream of pepper spray to prevent unarmed suspect from destroying evidence of a crime).

was not subject to lawful arrest would be liable for excessive force as a matter of law. *Id.* at 384-87.

Measured by this case law and the three factors outlined by the Supreme Court in *Graham*, we cannot say that Officer Bain's decision to use pepper spray could be found to be objectively unreasonable. The amount of force Bain used, though not trivial, was moderate. At the time he acted, the officers had probable cause to suspect Gaddis of two crimes that were also moderate in severity: driving while intoxicated, a misdemeanor for first offenders under Michigan law, and fleeing an officer.[10] While Gaddis arguably did not pose an immediate threat to the officers' safety as he stood next to his car brandishing a knife (since the officers were able to keep their distance), Bain could have reasonably concluded from Gaddis's erratic driving and behavior that he would pose a danger to other motorists if allowed to flee. Gaddis had announced his desire to leave the scene, and this statement prompted Bain to spray him. That fact is also relevant to the final *Graham* factor, namely whether the suspect was resisting arrest. Gaddis's remarks indicated an intent to continue evading arrest, and his brandishing of a knife was reasonably interpreted as a sign of intent to resist, perhaps violently.

In sum, Bain used an intermediate degree of nonlethal force to subdue a suspect who had previously attempted to evade arrest, was brandishing a knife, showed signs of intoxication or other impairment, and posed a clear risk of leaving the scene behind the wheel of a car. It cannot be said that this action was unconstitutionally excessive.

Gaddis disputes this reasoning, arguing that his incoherent remark about "Chris" put Bain on notice that Gaddis was disturbed, and that this made special tactics appropriate.

---

[10]The officers also knew that Gaddis was driving with an expired license.

Gaddis argues that a reasonable officer, suspecting Gaddis's disability, would not have responded to the brandishing of a knife by pointing a gun at Gaddis. Nor would he have "provoked" Gaddis by using an irritating and disorienting device such as pepper spray against him, as Bain did. Instead, a reasonable officer would have used a nonconfrontational manner that would ensure that Gaddis was not provoked to violence. To support this argument, Gaddis offered the affidavit of Prof. James Fyfe, a law enforcement expert. Fyfe testified that in his opinion, the officers' tactics in the encounter with Gaddis were "terrible" and were not in keeping with optimal police procedures for dealing with mentally or emotionally disturbed persons.

We acknowledge that a suspect's apparent mental state is one of the "facts and circumstances of [the] particular case," *Graham*, 490 U.S. at 396, that should be considered in weighing an excessive force claim. Moreover, the opinions of properly qualified experts such as Mr. Fyfe are often entitled "to be given . . . . weight" in this determination. *Russo*, 953 F.2d at 1047.[11] In *Russo*, we drew partially upon such testimony in concluding that the inadequate training procedures of the Cincinnati police department may have contributed to the shooting death of the plaintiff's suicidal, mentally ill decedent. *See id.* at 1046-47.

However, Gaddis's arguments here are weakened by the fact that Bain had only fragmentary evidence that Gaddis was mentally disturbed. This distinguishes the case from *Russo*, where officers knew from the outset that the suspect was mentally disturbed because the initial call to the police came from the mental institution the suspect had left. *Id.* at 1039. Here, Gaddis's incoherent conduct was arguably as consistent

---

[11]However, we note that the weight of such expert testimony is diminished to the extent that the expert draws near to opining on the ultimate legal question of whether the officers' challenged conduct was reasonable. *See Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990); *Burger v. Mays*, 176 F.R.D. 153, 157 (E.D. Pa. 1997).

with Bain's initial hypothesis that Gaddis was driving while intoxicated as it was with mental disturbance. The Supreme Court has instructed that we are to judge officers' conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. There may be more than one reasonable response to a given situation, and when this is so, the Fourth Amendment does not require officers to use "the most prudent course of action" to handle it. *See Cole*, 993 F.2d at 1334. In light of the circumstances and our reasoning above, we conclude Fyfe's affidavit is not sufficient to create a material issue of fact as to the reasonableness of Bain's use of pepper spray.

**D**

Similar reasoning leads us to conclude that Officer Burdick's decision to grapple with Gaddis in order to subdue him was not unconstitutionally excessive force. Burdick did not strike Gaddis or employ any weapons; his actions involved a degree of force comparable to Bain's use of pepper spray. Moreover, Gaddis's argument that a different response was required because of his emotional disturbance does not apply to Burdick. It was uncontroverted that Burdick did not hear the "Chris" remark that most strongly tended to suggest Gaddis's incoherence or emotional disturbance. As we have noted, the reasonableness of his response must be gauged in terms of the information available to him, not with hindsight. And "reasonableness" does not require that an action be "prudent" or the "best suited" to the situation, only that it not be unconstitutionally disproportionate in degree to the circumstances. Given that Bain's use of nonlethal force against Gaddis was reasonable, as we held at pp. 17-21, *supra*, it follows that Burdick's decision to grapple with Gaddis was reasonable as well.

**E**

Gaddis reacted to Burdick's attempt to grapple with him by stabbing at Burdick with his knife. Our last issue for consideration is the constitutionality of Officers Bain and Duffany's decision to respond to this attack with lethal force, by shooting Gaddis several times.

Lethal force is justified in order to protect a fellow officer or a civilian from a threat of serious physical harm. *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989). An attack with a knife certainly meets this criterion.[12] *See Pirsein v. Village of Berrien Springs*, No. 92-1258, 1992 WL 348944 (6th Cir. Nov. 24, 1992) (unpublished opinion). Bain and Duffany saw Gaddis strike at Burdick with a knife in his right hand. It was reasonable for them to respond with lethal force.

Gaddis relies upon *Samples v. City of Atlanta*, cited *supra*, and *Zuchel v. City of Denver*, 997 F.2d 730 (10th Cir. 1993), to argue that his use of a knife did not necessarily render the officers' actions justified. In *Samples*, the Eleventh Circuit denied qualified immunity to an officer who fatally shot Samples as Samples approached him with a three-inch folding knife. 846 F.2d at 1331-33. *Zuchel* involved a suspect who was believed to have a knife, and who was fatally shot by an officer shortly after he turned to face the officer. 997 F.2d at 735-36. The Tenth Circuit held that these facts were sufficient to support a verdict for the plaintiff against the officer's municipal employer. *Ibid*.

Both cases are distinguishable from Gaddis's. In *Samples*, the officer shot a suspect who was, at most, merely opening

---

[12]That conclusion does not change when we take into consideration the "moments preceding the shooting," as precedent requires. *Dickerson*, 101 F.3d at 1162. We have previously held that Bain's and Burdick's uses of nonlethal force to apprehend Gaddis did not raise a jury issue as to excessiveness under the Fourth Amendment.

a knife, and had not yet attacked anyone with it. 846 F.2d at 1332. Moreover, Samples was shot once in the back – a detail that was highly salient to his case, because there was only one officer confronting Samples. The back wound suggested that the officer might have used lethal force against Samples at a time when he clearly did not pose a threat to the officer. *Ibid.* Here, Gaddis had not only extended the blade of his knife but had attacked Officer Burdick with it. Moreover, while Gaddis, like Samples, also received a wound from the back from the shots fired at him, the fact was that multiple officers were firing at Gaddis from different vantage points after his attempt to stab Burdick. Thus Gaddis's back wound does not tend to undercut the officers' testimony (corroborated by the videotape) that they fired only in response to the knife attack.

In *Zuchel*, the facts suggested that Zuchel was not threatening anyone or brandishing a weapon aggressively when police shot him. Indeed, the only evidence that Zuchel even had a knife came from one bystander's shouted warning to the police. 997 F.3d at 735-36. Here, again, Gaddis had a knife and used it.

Gaddis finally suggests that even if his actions justified a lethal response, the officers crossed the constitutional line by firing sixteen shots at him. We disagree. While the two officers fired a total of sixteen shots at him, it was a single volley. That distinguishes Gaddis's case from precedents such as *Russo*, where police went on to fire a second and third volley at the suspect even though there was a factual dispute as to whether he still posed a serious threat. *See* 953 F.2d at 1045. Bain's and Duffany's decisions to use their weapons to respond to Gaddis's attack were individually justifiable, and the fact that there were two of them responding simultaneously, thereby producing a larger volley, does not change the reasonableness of their conduct.

## V

For the foregoing reasons, the district court's grant of summary judgment to the officers is AFFIRMED. Because there was no underlying constitutional violation by the officers, the municipal defendants cannot be held liable to Gaddis. *Monday*, 118 F.3d at 1105. The grant of summary judgment to the municipal defendants is therefore also AFFIRMED.

—————————

**DISSENT**

—————————

CLAY, Circuit Judge, dissenting. Because the majority, like the district court below, usurps the role of the jury and violates the plain dictates of Federal Rule of Civil Procedure 56, I dissent.

**I.**

My disagreement begins with the majority's holding that Officer Matthew Bain's initial traffic stop of Joseph Gaddis complied with the Fourth Amendment as a matter of law. Most appellate review of a district court's determination about the propriety of a traffic stop arises on direct criminal appeal after a district court has denied a motion to suppress evidence discovered after the stop. In that procedural posture, the Court upholds the district court's findings of fact regarding the existence of probable cause "unless clearly erroneous," and the district court's legal conclusion as to the existence of probable cause is reviewed *de novo. United States v. Hill,* 195 F.3d 258, 264 (6th Cir. 1999); *see also Ornelas v. United States,* 517 U.S. 690, 699 (1996). By contrast, in a § 1983 action on appeal from the grant of a summary judgment against the plaintiff, the Court reviews *both* the district court's factual assessments (i.e., whether there are genuine issues of material fact) *and* the legal conclusions under a *de novo* standard. *See Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir. 1995) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.") (citing *Yancey v. Carroll County,* 876 F.2d 1238, 1243 (6th Cir.1989)). Although the majority opinion states that "we must resolve disputes of fact in favor of the nonmoving party, Gaddis, drawing all inferences in his favor," Op. at 3 (citing *Burchett v. Kiefer,* 310 F.2d 937, 941-42, 945 (6th Cir. 2002)), the remainder of the opinion reveals that the majority

has simply paid lip service to this bedrock principle of summary judgment law.

The failings of the majority opinion begin with its description of the allegedly undisputed facts that preceded Officer Bain's initial traffic stop of Gaddis. This much is undisputed: Gaddis was driving his car shortly before 4:00 a.m. on April 12, 1999, in Redford Township, when Officer Bain spotted Gaddis' car while patrolling alone on Telegraph Road. It is also undisputed that Officer Bain's patrol car created a video, but not an audio, record of Bain's counter with Gaddis. It is not undisputed, however, that Bain saw Gaddis "weaving" within his traffic lane. Op. at 3. According to the Oxford English Dictionary, "weave" means to "move repeatedly from side to side; to toss *to and fro*; to sway the body alternately to one side and the other; to pursue a devious course, thread one's way amid obstructions." *Oxford English Dictionary Online Edition* (taken from second print edition 1989) (emphasis in original). Webster's Dictionary defines "weave" to mean "to direct (as the body) in a winding or zigzag course esp. to avoid obstacles." *Webster's Third New Int'l Dictionary* 2591 (1993). The videotape evidence does not show – or at least a reasonable jury would not be compelled to conclude – that Gaddis moved repeatedly side to side or that he was driving his car on a zigzag course. Rather, the tape shows Gaddis gradually veering within his lane on two occasions, barely touching (but not crossing) the white line separating his lane from the lane traveling in the same direction. Thus, there is a significant dissonance between Bain's characterization of Gaddis' driving (weaving) and what the videotape actually reveals (a gradual drifting to the lane marker on two occasions).

Bain's credibility regarding Gaddis' alleged weaving is undermined not only by the videotape, but also by his 1999 conviction for third degree criminal sexual conduct for which Bain currently is serving a prison term of 42 months to 15 years. *See* Fed. R. Evid. 609(a)(1) (providing that evidence that a witness has been convicted of a crime punishable by

imprisonment in excess of one year shall be admitted if its probative value outweighs its prejudicial effect). Although ultimately it is within the district court's discretion to admit evidence of a prior criminal conviction for impeachment purposes, Bain's conviction arguably tends to undermine the testimony of the most significant defense witness in this case as to all material issues.

The majority next accepts as undisputed fact Bain's testimony that Gaddis had been "driving somewhat slowly," a fact the majority declares to be supported by the cars passing Gaddis in the other lane. Op. at 3-4. There is no evidence, however, that Gaddis was traveling under the speed limit, nor is it undisputed that his speed was so slow as to suggest that he may have been under the influence of alcohol. *Cf. United States v. Little,* No. 97-6200, 1999 WL 196515, at *1 (6th Cir. Mar. 24, 1999) (noting that trooper suspected defendant was a drunk driver "[b]ecause intoxicated drivers commonly travel at *excessively* high or low speeds") (emphasis added). In fact, Bain testified that he has no recollection of what the other cars were doing on the night in question, suggesting that the relative speed of Gaddis' car did not inform Bain's decision to stop Gaddis at all. *See United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir. 1993) (*en banc*) ("We note that this probable cause determination, like all probable cause determinations, is fact-dependent and will turn on what the officer knew *at the time he made the stop.*") (emphasis in original). Further, it reasonably could be inferred from the videotape that cars were passing Gaddis because he was traveling at or near the speed limit and the other drivers were exceeding the speed limit. Consistent with this inference, Officer Bain admits that he never saw Gaddis violate any provision of the Michigan Motor Vehicle Code. Thus, there is a genuine issue of material fact as to whether Gaddis was traveling at an excessively slow speed that reasonably would have suggested drunk and/or careless driving.

The majority next states that Bain testified that he "saw Gaddis slumping to the right inside his car as he held the wheel." Op. at 4. The Oxford English Dictionary defines "slump" to mean to "slide *off* heavily; to plump down; to fall or collapse clumsily or heavily." *Oxford English Dictionary Online Ed.* (emphasis in original). However, Bain did not testify that Gaddis was slumping or that he appeared to be in a state of fall or collapse. He actually testified that he saw Gaddis "leaning over to the right," but that he "couldn't see into the car to see what he was doing." (J.A. 567.) Although "leaning" and "slumping" arguably fall along the same continuum, there is a world of difference between the two physical states. Drivers frequently lean in their cars when adjusting the radio or reaching for a cigarette lighter or a cellular telephone. Some drivers are just more comfortable or may even enjoy driving with a leaning posture. Although such leaning is not inconsistent with intoxication, it also is not inconsistent with a host of other innocent causes. By transforming Gaddis' lean into a "slump," the majority continues its incremental stacking of the "undisputed" facts against Gaddis. Moreover, as acknowledged by the majority and the district court below, the tape does not show Gaddis' posture at all, another fact that bears directly on the credibility of Bain, who testified not only that he saw Gaddis leaning, but that the tape "could pick that up." It is inexplicable, then, why the majority not only ignores the absence of "leaning" evidence on the videotape but also embellishes Bain's testimony. The far more judicious tact would be to acknowledge that a reasonable inference from the absence of "leaning" evidence is that Gaddis was not leaning at all.

According to the majority, Bain's purported observation of Gaddis' "weaving," slow driving speed and "slumping" led Bain to suspect that Gaddis had been driving drunk. Op. at 3-4. This is only partially true. Bain testified that he thought Gaddis "was driving carelessly, *and* [he] thought [Gaddis] might be intoxicated." (J.A. 568.) (emphasis added). Thus, Bain suspected that Gaddis might be violating two provisions of the Michigan Motor Vehicle Code – Mich. Comp. Laws

§ 257.625 (prohibiting operation of vehicle while under the influence of alcoholic liquor) and § 257.626b (prohibiting careless or negligent driving).

In *Whren v. United States,* 517 U.S. 806 (1996), the Supreme Court held, "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810 (citations omitted). The Court further characterized the probable cause standard for suspected traffic law violations as "the normal one," the "traditional justification" and "the usual rule." *Id.* at 810, 817 (emphasis omitted), 818. Our Court, sitting *en banc*, similarly held that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful." *Ferguson,* 8 F.3d at 391; *accord United States v. Freeman,* 209 F.3d 464, 466 (6th Cir. 2000) (following *Ferguson*); *Hill,* 195 F.3d at 264 ("[A]n officer may stop a vehicle for a traffic violation …as long as the officer had probable cause to initially stop the vehicle.") (citing *Whren*). Despite these clear statements by the Supreme Court and our own *en banc* Court, the majority opines that it is unsettled in this circuit as to whether the police need probable cause to stop a vehicle for a suspected traffic law violation. Op. at 12 n.6. The majority appears to base its reasoning on the ground that the *Whren* opinion fails to state explicitly that the decision to stop an automobile is reasonable *only* when the police have probable cause to believe that a traffic violation has occurred. *See* Op. at 9 n.4 ("Indeed, *Whren* did not even hold that all stops premised on a civil traffic violation require probable cause …."). This reading of *Whren,* however, ignores the context of the Supreme Court's above-quoted statement, which was a response to the petitioner's argument that "'in the unique context of civil traffic regulations' probable cause is not enough." *Whren,* 517 U.S. at 810. Although the Court refused to adopt a more stringent constitutional standard than probable cause for suspected traffic law violations, the Court gave no indication that in fact a lesser constitutional standard

applies. To the contrary, at the conclusion of its opinion, the Court stated:

> For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure. Here the District Court found that the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment….

*Id.* at 818-19. Because it is settled that probable cause is required for suspected civil violations of the traffic laws, Officer Bain clearly needed probable cause to stop Gaddis on suspicion of careless driving. *Cf. United States v. Ervin,* 59 Fed. Appx. 631, 635 (6th Cir. 2003) (holding that officer needed probable cause to stop driver for violating Florida's careless driving statute).

Ignoring Officer Bain's careless driving justification for the stop, the majority holds that Bain needed only a reasonable suspicion that criminal activity was afoot before he could stop Gaddis on suspicion of drunk driving because drunk driving is a criminal offense in Michigan. Op. at 8-9. *See also* Mich. Comp. Laws § 257.625(9)(a) (providing that a person who operates a vehicle while intoxicated "is guilty of a misdemeanor"). As support, the majority opinion cites *United States v. Arvizu,* 534 U.S. 266 (2002), *Alabama v. White,* 496 U.S. 325 (1990) and *United States v. Hensley,* 469 U.S. 221, (1985). Op. at 8. None of these cases is relevant, however, because none of the suspected crimes in those cases bore an inherent connection to the operation of a motor vehicle, and none involved a suspected violation of the traffic laws. *See Arvizu,* 534 U.S. at 272, 273 (minivan stopped on suspicion that narcotics were being smuggled); *White,* 496 U.S. at 327 (vehicle stopped due to anonymous tip that driver had been transporting drugs); *Hensley,* 469 U.S. at 677-78 (vehicle stopped on suspicion that the driver was wanted for armed robbery). By contrast, drunk driving necessarily

involves the operation of a motor vehicle and constitutes a violation of the traffic laws. Under Michigan law, the drunk driving prohibition, like the civil prohibition against speeding, is located within Chapter VI of the Michigan Motor Vehicle Code, entitled in conspicuous type, "OBEDIENCE TO AND EFFECT OF TRAFFIC LAWS."

Subjecting careless driving and drunk driving to different constitutional standards makes no sense legally and practically. Stops for both types of violations generally are premised on an officer's observations, "which afford the 'quantum of individualized suspicion' necessary to ensure that police discretion is sufficiently constrained." *Whren,* 517 U.S. at 817-18 (quoting *Delaware v. Prouse,* 440 U.S. 648, 654-55 (1979); internal quotation marks and citation omitted). The mere fact that the respective penalties for careless driving versus drunk driving deem the former a civil violation and the latter a crime has no bearing whatsoever on the manner in which police officers detect these violations. Moreover, different standards for these two traffic violations might encourage police officers to avoid the higher constitutional standard applicable to stops for careless driving, speeding, failing to signal, etc. by "tacking on" a drunk driving suspicion. In many instances, the majority's reasonable suspicion standard for drunk driving could swallow the probable cause standard applicable to all other traffic law violations.

Because the Supreme Court (in *Whren*) and this Court (*en banc* decision in *Ferguson*) clearly have held that a stop for suspected traffic violations must be premised on probable cause and because there is no legal or practical basis to subject drunk driving to a different constitutional standard than other suspected traffic violations, this Court should follow the panel decisions of our Court that relied on *Whren* and/or *Ferguson* in applying a probable cause standard to suspected drunk driving. *See Freeman,* 209 F.3d at 467 (applying *Ferguson*'s probable cause standard in holding that officer lacked probable cause to stop vehicle for suspected

drunk driving); *United States v. Palomino,* 100 F.3d 446, 448 n.1 (6th Cir. 1996) (applying *Whren*'s probable cause standard to challenge to traffic stop for suspected drunk driving; affirming district court's holding that the officer had probable cause to believe that the traffic violation of driving while intoxicated had occurred); *accord United States v. Carlton,* 44 Fed. Appx. 720, 722 (6th Cir. 2002) (holding that officer had probable cause to suspect drunk driving based on "erratic driving"); *United States v. Little,* No. 97-6200, 1999 WL 196515, at *4 (6th Cir. Mar. 24. 1999) (holding that the totality of the circumstances created probable cause to believe that the defendant had been driving drunk). To the extent *United States v. Roberts,* 986 F.2d 1026, 1029 (6th Cir. 1993) adopted a reasonable suspicion standard for drunk driving stops, *Whren* and *Ferguson* have abrogated that case.

As previously discussed, there is a genuine issue of material fact as to whether Gaddis had been leaning in his car and, if so, to what extent. There also is a genuine issue of material fact as to whether Gaddis had been driving at a speed so excessively slow as to be indicative of impaired driving. Thus, the only undisputed fact is that Gaddis' car gradually drifted toward and eventually touched the painted hashes on two occasions. This fact alone does not create probable cause to suspect, or even a reasonable suspicion of, drunk driving as a matter of law. *Cf. Freeman,* 209 F.3d at 466 ("If failure to follow a perfect vector down the highway or keeping one's eye on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy.") (internal quotation marks and citations omitted). Cases finding probable cause to arrest for drunk driving have required more indicia of impaired driving than two instances of a gradual drifting onto a lane marker. *See, e.g., Palomino,* 100 F.3d at 448 (holding drunk driving stop to be constitutional where driver had been traveling significantly under the speed limit, had crossed two lanes of traffic at once, had straddled the right lane, and had been weaving back and forth between the right lane and the emergency lane);

*Carlton,* 44 Fed. Appx. at 722 (holding drunk driving stop to be constitutional where driver had "weaved from side to side at least three times on" two different streets); *Little,* 1999 WL 196515, at *4 (holding drunk driving stop to be constitutional where driver had been traveling at "an unusually slow speed," had allowed her speed to fluctuate, and had weaved on the highway's shoulder). I do not foreclose the possibility that a jury might find  probable cause if it were to find that Gaddis was not in control of his vehicle, as evidenced by leaning, slouching and/or an excessively slow speed. It simply is my position that  this Court lacks the authority to usurp the jury's role in finding the facts that may support such a legal conclusion.

## II.

Gaddis' excessive force claim centers around the batteries he suffered after Officer Bain had pulled him over for suspected traffic violations, most significantly the 16 bullets that Officers Bain and Duffany fired at Gaddis. The key circumstance that precipitated the shooting was the alleged belief of at least two of the officers that Gaddis had had a knife in his hand. As the majority opinion notes, "If a reasonable jury could find that Gaddis did *not* have a knife, then it could unquestionably go on to find that shooting him was unconstitutionally excessive force … and the grant of summary judgment would have to be reversed." Op. at 15-16 (citation omitted; emphasis in original). As discussed below, a reasonable jury should be permitted to make just such a finding and, therefore, the summary judgment should be reversed.

After Gaddis finally stopped his car, Officer Bain drew his gun and approached. Bain then re-holstered his gun and pulled out his flashlight. After a delay, Gaddis passed a piece of paper to Bain who looked at it and stuffed it in his pocket. Soon, Officers Burdick and Duffany arrived in their car. Gaddis then exited his car and put his hands in his pockets. Bain briefly grabbed Gaddis by the collar and pulled Gaddis

toward him. Shortly thereafter, Gaddis removed his hands from his pockets. According to Bain and Burdick, they saw a knife in Gaddis' hand. Burdick described the knife as "large," "long," and "the biggest knife [he] had ever seen." Bain's testimony conflicts with Burdick's in that Bain saw only a small knife. Duffany saw something shine, but he did not know what it was. Bain then pulled his gun on Gaddis, as did Burdick. Duffany pulled his gun in response to Bain's reaction in pulling his gun. Officer Paul Champoux, who had arrived on the scene around this time, testified that he could not tell if Gaddis had anything in his hand. Nevertheless, he "racked" a shell into the chamber of his shotgun and leveled it at Gaddis in order to "startle" Gaddis.[1] The knife that Defendants claimed to have recovered from Gaddis was less than three inches long.

If all of the officers had seen Gaddis with a knife, but happened to disagree about the knife's length, there would be no genuine dispute as to whether Gaddis had been brandishing a knife. Here, however, two of the officers could not determine what Gaddis had been holding, even though another officer testified that Gaddis had wielded a large and long knife. Thus, the officers' credibility is open to question, particularly that of Bain, a convicted criminal. Moreover, as discussed below, there are several additional pieces of evidence that further undermine the officers' claim that Gaddis had been holding a knife.

First, there is no physical evidence of the stab wound Gaddis allegedly inflicted on Officer Burdick. Officer Burdick testified that Gaddis had stabbed him in the back while Burdick had been attempting to place Gaddis in a headlock. Burdick, who had been wearing a flak jacket at the time, claims to have suffered a cut on his back that resulted in a circle of blood soiling his white t-shirt. The bloody t-

---

[1]Champoux is no longer a police officer. He resigned allegedly for personal reasons after pleading guilty to impaired driving.

shirt, however, was not preserved as evidence at the crime scene, and its whereabouts are unknown. The police shirt that Burdick wore over the t-shirt was preserved in evidence, but had no blood on it.[2] The back of the flak jacket, where Burdick allegedly had been stabbed bore only a "speck"-sized hole, and Burdick has no scar from the alleged knife attack. This utter lack of physical evidence of a stab wound, particularly when combined with the fact that no officer preserved Burdick's purported blood-soaked t-shirt, in derogation of proper investigative practice,[3] tends to undermine Burdick's testimony that he had suffered a stab wound from Gaddis. A reasonable inference from the lack of a stab wound is that Gaddis had not been holding a knife when he struck Burdick.

Second, there is no reliable physical evidence linking Gaddis to the knife that Defendants attribute to Gaddis. Jeffrey Wanbaugh, the evidence technician who arrived on the scene after Gaddis had been shot, was apprised by an officer that Gaddis allegedly had been wielding a knife and had stabbed Burdick. Wanbaugh testified that he discovered a set of car keys and a leather sheath lying on the front driver's seat of Gaddis' car, but that he did not know when either of those items had been placed on the seat, nor by whom. He also testified that he had wanted to see what was inside of the sheath and discovered a knife inside. Although Wanbaugh photographed this knife, he did not take it into evidence. Wanbaugh further testified that he collected a second knife on the ground and about four feet from Gaddis' car. An officer on the scene told Wanbaugh that Gaddis had used this knife to strike Burdick.

---

[2] It is unclear whether the shirt bears any evidence of having been pierced or cut. The parties have not discussed the issue.

[3] At deposition, Burdick testified that he had been trained to preserve evidence of blood-soiled clothing.

Despite the manifest importance of this second knife, Wanbaugh did not collect it until he had been on the scene for a half an hour. And although Wanbaugh took the second knife into evidence, he made no attempt to determine whether it bore the fingerprints of Gaddis or the police officers. He simply took the word of an officer on the scene that Gaddis had used the knife to strike Burdick. Wanbaugh's failure to fingerprint and establish a reliable chain of custody for this second knife, combined with the fact that he never took the first knife into evidence, can support the reasonable inferences that (1) Gaddis actually had possessed only one knife, the one recovered from inside of his car, and (2) the second knife, which was neither fingerprinted nor tested for blood, may have been planted at the scene by one of the officers.

Third, a reasonable jury could conclude that the videotape does not show Gaddis holding a knife. The majority opinion concedes that, when viewing the videotape, a knife cannot be discerned in Gaddis' hand. Op. at 17 ("While the tape would not enable a juror directly to verify the presence of a knife, it equally would not permit him or her to conclude that there was no knife."). Combined with the other evidence that undermines the officers' credibility, one reasonable inference is that Gaddis did not have a knife in his hand at the time. The majority explains away this inference as well. Employing colorful descriptions that could be more appropriately presented in Defendants' closing argument to the jury, the majority zeroes in on "the body language of the actors during the encounter," concluding that "the officers' reactions powerfully corroborate" the conclusion that Gaddis had a knife. *Id.* The majority first points to the fact that Bain jumped back "in obvious alarm" after Gaddis had removed his hands from his pocket and argues that this reaction is "inexplicable unless something threatening was in Gaddis' hands." *Id.* I agree that the tape arguably supports such an inference, but it is not the only inference that explains Bain's body language. The tape also supports the inference that Bain was concerned that Gaddis was going to strike him with his

empty fist or with his car keys or with a stick of foil-wrapped chewing gum or any other harmless object that might glisten in the dark. Bain's movements also would support the inference that Bain was not alarmed at all, but that he had become angry or frustrated with Gaddis and wanted to escalate the confrontation by drawing his gun.

As additional "body language" evidence, the majority opinion points to the "windmilling motion" that Gaddis used to strike at Burdick after Burdick had attempted to jump Gaddis from behind. Op. at 17. Without citation and without the benefit of any expert testimony, the majority concludes as a matter of law that this motion is "suggestive of a knife stab." *Id.* This windmilling motion, however, also is suggestive of striking someone with a fist or of an involuntary, reflexive attempt to protect oneself from a surprise attack. It is wholly inconsistent with Rule 56 for my colleagues to adjudicate this issue against Gaddis simply because he did not swing his arm in a manner consistent with their imaginations. The inference that Gaddis had threatened the officers with a knife is not the only reasonable inference from the officers' body language depicted on the videotape. *Cf. Headwaters Forest Def. v. County of Humboldt,* 211 F.3d 1121, 1132 n.5 (9th Cir. 2000) ("The videotape evidence here appears to raise more questions than it answers, which in the context of a motion for judgment as a matter of law must be resolved in favor of the plaintiffs as the nonmoving parties."), *vacated on other grounds,* 534 U.S. 801 (2002).

### III.

Even assuming, *arguendo,* that Gaddis had been wielding a knife, there is a genuine issue of material fact as to the reasonableness of the officers' use of force. Gaddis' expert witness on law enforcement matters, Dr. James Fyfe, points out several deviations from accepted police practice that resulted in the officers' unnecessary escalation of the confrontation with Gaddis. For example, Bain testified that he blasted Gaddis with pepper spray because he was

concerned that Gaddis would try to get in his car and drive away. The videotape, however, does not evidence any "body language" on Gaddis' part that is consistent with a desire to leave the scene. Moreover, as Dr. Fyfe notes, the tactically more appropriate decision would have been to position the police vehicles around Gaddis' car so that it would have been impossible for him to escape. Officer Champoux testified that he could have blocked Gaddis' car with his patrol car if Gaddis had tried to leave.

The pepper spray blast was only the prelude to the most egregious examples of improper police tactics. According to Dr. Fyfe, the confrontation with Gaddis "unfolded as a series of surprises" because "nobody was in charge, there was no central plan, and there was no attempt to assure that officers knew what each other was doing and what it was expected to accomplish." (J.A. 745.) Most notably, without any warning to his colleagues, Officer Burdick scrambled over the back of Gaddis' car in an attempt to ambush Gaddis. Dr. Fyfe points out that officers are instructed to keep their distance from people who are armed with knives, unless there is absolutely no way to protect an individual from an imminent threat to life. It is clear that, prior to Burdick engaging in his ill-advised tactic, no one's life was in danger. As the tape shows, Gaddis became aware of Burdick's presence on his car and reacted predictably by swinging his hand at Burdick, allegedly stabbing Burdick with a knife. Thus, Burdick unreasonably created a foreseeable circumstance in which the other officers were forced to take action to protect him from Gaddis.

According to Defendants, the officers had no choice but to open fire on Gaddis. Burdick's testimony and the videotape, however, strongly indicate that the officers shot Gaddis after he no longer posed a danger to Burdick. Burdick testified that he was on the ground at the back of Gaddis' car at the time the other officers began shooting Gaddis. Based on this evidence, Dr. Fyfe opines that Burdick was well out of Gaddis' range at the time Gaddis was being shot, and,

therefore, Gaddis presented no danger to Burdick or anybody else at that time. Indeed, it would have been extremely reckless for the officers to have shot at Gaddis while Burdick was near Gaddis. Accordingly, even assuming that Gaddis had been wielding a knife and that it was reasonable for Burdick to jump him from behind, there is a genuine issue of material fact as to whether it was reasonable for Officers Bain and Duffany to have shot at Gaddis 16 times.

## IV.

It appears that at every turn my colleagues have taken great pains to construe each factual dispute as immaterial and/or draw inferences from the evidence that favor only Defendants. This approach is inconsistent with both the letter and the spirit of Rule 56. It is disputed whether Bain had probable cause, or even reasonable suspicion, to stop Gaddis for careless driving or drunk driving, since all that is undisputed is that Gaddis' car gradually veered and touched the painted hashes on the road on two occasions. It is disputed whether Officers Bain and Duffany acted reasonably in firing 16 gun shots at Gaddis because it cannot be concluded as a matter of law that Gaddis had been brandishing a knife or any other dangerous object. The officers' testimony is inconsistent as to the presence and size of the purported knife; there remain serious questions about the authenticity of the knife the officers' attribute to Gaddis; the officers failed to preserve any physical evidence that would have proven that Gaddis had wounded Officer Burdick with the knife; and the videotape is consistent with the inference that Gaddis had not wielded a knife. Moreover, even assuming that Gaddis had been holding a knife, the purported need to shoot him was precipitated by Officer Burdick's bumbling attempt to subdue him. And although the officers justified their shooting as necessary to protect Burdick, the evidence strongly indicates that Burdick was out of harm's way at the time the shooting had begun. From these facts, it reasonably could be inferred that the officers who fired at Gaddis did not intend to protect Burdick, but to kill

Gaddis. The responsible thing to do would be to reverse the district court's grant of summary judgment.